934 A.2d 651 (2007)
396 N.J. Super. 405
Andrew McKENZIE; Arthur Bandel; Joanne E. Deibert; Arthur Mattei; David J. O'Neill; Brigid Kernan, Marie V. Morris; Mary Sullivan; Leonard Crann; Anne Marie Crann; Kathleen Reid; Alfred R. Beronio; Peter Marsico; Sharyn L. Cartnick; C. Louis Cartnick; New Jersey Right to Life Committee, a Non-Profit Corporation, Plaintiffs-Appellants,
v.
Jon CORZINE, Governor of the State of New Jersey; Nina Mitchell Wells, Secretary of State of the State of New Jersey; Anne Milgram, Attorney General of the State of New Jersey; Edward P. McGettigan, Atlantic County *652 Clerk; Kathleen A. Donovan, Bergen County Clerk; Philip E. Haines, Burlington County Clerk; James Beach, Camden County Clerk, Rita Marie Fulginiti, Cape May County Clerk; Gloria Noto, Cumberland County Clerk; Christopher J. Durkin, Essex County Clerk; James Hogan, Gloucester County Clerk; Barbara A. Netchert, Hudson County clerk; Mary Melfi, Hunterdon County Clerk; Paula Sollami Covello, Mercer County Clerk; Elaine Flynn, Middlesex County Clerk; M. Claire French, Monmouth County Clerk; Joan Bramhall, Morris County Clerk; Carl W. Block, Ocean County Clerk; Karen Brown, Passaic County Clerk; Gilda T. Gill, Salem County Clerk; Brett A. Radi, Somerset County Clerk; Erma Gormley, Sussex County Clerk; Joanne Rajoppi, Union County Clerk; and Patricia Kolb, Warren County Clerk, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 22, 2007.
Decided October 26, 2007.
*653 Bertram P. Goltz, Jr., Edison, argued the cause for appellants (Legal Center for Defense of Life, Inc., attorneys; Edward J. Gilhooly, Morristown, of counsel; Mr. Goltz, on the brief).
Larry R. Etzweiler, Senior Deputy Attorney General, argued the cause for respondents Jon Corzine, Governor of the State of New Jersey; Nina Mitchell Wells, Secretary of State of the State of New Jersey and Anne Milgram, Attorney General of the State of New Jersey (Anne Milgram, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Mr. Etzweiler and Mary Beth Wood, on the brief).
John M. Carbone, Ridgewood, argued the cause for respondent Kathleen A. Donovan, Bergen County Clerk (Carbone and Faasse, and Esther Suarez, Bergen County Counsel, attorneys; Mr. Carbone, of counsel and on the brief).
John C. Porto, Cape May County Counsel, attorney for respondent Rita Marie Fulginiti, Cape May County Clerk (James B. Arsenault, Jr., Assistant County Counsel, on the brief).
Ronald Kevitz, Morris County Counsel, attorney for respondent Joan Bramhall, Morris County Clerk (Mr. Kevitz, on the brief).
Dennis R. McConnell, Sussex County Counsel, attorney for respondent Erma Gormley, Sussex County Clerk (Dennis J. Lenard, on the brief).
Samuel J. Leone, Gloucester County Counsel, attorney for respondent James N. Hogan, Gloucester County Clerk (Thomas G. Campo, Assistant County Counsel, on the brief).
Gary D. Wodlinger, Cumberland County Counsel, attorney for respondent Gloria Noto, Cumberland County Clerk (Mr. Wodlinger, on the letter relying on the brief filed by the Attorney General).
Donato J. Battista, Hudson County Counsel, attorney for respondent Barbara A. Netchert, Hudson County Clerk (Mark E. Morchel, Deputy County Counsel, on the letter relying on the brief filed by the Attorney General).
Malcolm V. Carton, Monmouth County Counsel, attorney for respondent M. Claire French, Monmouth County Clerk (Andrea I. Bazer, Special Monmouth County Counsel, on the letter relying on the brief filed by the Attorney General).
John C. Sahradnik, Ocean County Counsel, attorney for respondent Carl W. Block, Ocean County Clerk (Laura M. Benson, Assistant County Counsel, on the letter relying on the brief filed by the Attorney General).
Deborah Silverman Katz, Camden County Counsel, attorney for respondent James Beach, Camden County Clerk (Donna M. Whiteside, Assistant County Counsel, on the brief).
No other respondents filed a brief.
Before Judges STERN, A.A. RODRÍGUEZ and C.S. FISHER.
The opinion of the court was delivered by
*654 FISHER, J.A.D.
In this appeal, plaintiffs claim that the interpretive statement adopted by the Legislature in seeking voter approval of the New Jersey Stem Cell Research Bond Act of 2007 (the Act), L. 2007, c. 117, inadequately and unfairly describes the question the voters are being asked to decide in the general election to occur on November 6, 2007. In deferring to the choices that the Legislature was entitled to make in crafting this interpretive statement, we conclude that it fairly describes without bias the Act's contents and affirm the dismissal of the complaint.

I
The Act, according to its preamble,
authoriz[es] the creation of a debt of the State of New Jersey by the issuance of bonds of the State in the aggregate principal amount of $450 million for the purpose of financing stem cell research grants, and the costs thereof, for institutions of higher education and other entities in the State conducting scientific and medical research; providing the ways and means to pay and discharge the principal of and interest on the bonds; providing for the submission of this act to the people at a general election; and making an appropriation therefor.
Plaintiffs' complaint does not attack the validity or constitutionality of the Act but instead seeks to prevent its inclusion on the ballot for the general election of November 6, 2007 because, in their view, the Legislature's interpretive statement is inadequate and biased. That is, plaintiffs, who describe themselves in their complaint as citizens, residents and taxpayers of this State, base their request for an injunction, which would prohibit the Act's inclusion on the ballot, on their claim that the Legislature's interpretive statement is "not informative and fair," that it is "unbalanced and biased," and that it will cause voter confusion and uncertainty.
The public question to be considered by the voters on November 6, 2007, as posed by the Act itself, asks:
Shall [the Act], which authorizes the State to issue bonds in the amount of $450 million for grants to fund "stem cell research projects," as defined in the act, at institutions of higher education and other entities in the State conducting scientific and medical research, and providing the ways and means to pay the interest on the debt and also to pay and discharge the principal thereof, provided that recurring revenues of the State are certified by the State Treasurer to be available in an amount equal to the sum necessary to satisfy the annual debt services obligations related to such bonds, be approved?
[L. 2007, c. 117, § 23.]
The interpretive statement authorized to be placed on the ballot pursuant to the Act itself states in full:
Approval of this act would authorize the sale of $450 million in State general obligation bonds to provide grants for stem cell, scientific, and medical research, as defined in the act, at institutions of higher education and other nonprofit and for profit entities in the State conducting scientific and medical research, provided that recurring revenues of the State are certified by the State Treasurer to be available in an amount equal to the sum necessary to satisfy the annual debt service obligations related to such bonds. Grants would be awarded by the Commission on Science and Technology, subject to evaluation by an independent research review panel composed of experts in stem cell and related research and by an *655 independent ethics review panel. If a grant recipient realizes a financial gain or benefit directly associated with the research funded by its grant, the act requires the recipient to make payments to the State in an amount representing a reasonable return on the State's investment, as determined by the State Treasurer. The purpose of providing these funds is to promote research that could benefit State residents afflicted with diseases and severe injuries such as Alzheimer's disease, cancer, diabetes, Lou Gehrig's disease, Parkinson's disease, sickle cell anemia and spinal cord injuries.
[Ibid.]
Plaintiffs argue that this interpretive statement fails to meet the standards contained in N.J.S.A. 19:3-6, as illuminated by Gormley v. Lan, 88 N.J. 26, 438 A.2d 519 (1981). Their forty-two page complaint, which was filed on September 18, 2007, contains sixteen counts, each of which asserts that the interpretive statement fails to conform to the proper standard because it
1. "fails to inform the voters that the contemplated research will be done on human embryos: human beings created for the specific and sole purpose of being experimented upon and then destroyed";
2. "makes no reference to human cloning, thereby allowing the voters to believe that `human cloning' or `cloning of a human being,' however those terms might be defined, is not in any way to be involved in the research to be financed pursuant to the Act";
3. "fails to inform the voters that the purported prohibition of `human cloning' contained in [L. 2007, c. 117, § 5(e)] is to be interpreted and understood in light of the meaning of `cloning of a human being' specified by N.J.S.A. 2C:11A-1, which, rather than prohibiting human cloning, in reality allows it `through the . . . newborn stage[]'";
4. "fails to inform the voters that [the] prohibition [contained in L. 2007, c. 117, § 5(e)] of the use by an eligible research institution of authorized or available funds for human cloning pertains solely to replicating a human individual by cultivating a cell with genetic material through each and all of the developmental stages specified by N.J.S.A. 2C:11A-1  the egg, embryo, fetal and finally newborn stages  into a new human individual"; fails to inform that "the replication process is stopped short of proceeding through all of those stages and does not culminate in the final stage, [its] prohibition is not offended"; and fails to inform "that the replication process therefore may manipulate the human egg, human embryo and then human fetus in any manner whatsoever, throughout what would otherwise be the entire normal gestational process, as long as the manipulation does not culminate in a newborn child";
5. "fails to inform the voters that the embryonic stem cell research contemplated by the Act requires human eggs, which can be obtained only from women, and that thousands of women will need to undergo egg extraction procedures to provide eggs for such research";
6. "fails to inform the voters that there are serious and substantial risks to women's health posed by the practice of multiple egg extraction to harvest eggs for embryonic stem cell research";
7. "fails to inform the voters that egg extraction is accomplished by means of drugs used for in vitro fertilization (IVF) treatments[,] . . . does not inform the people that pharmaceutical firms have not been required by either the government or physicians to collect safety data for IVF drugs regarding risk of *656 cancer or other serious health conditions despite the drugs having been available in the United States for several decades and that the long-term health risks for women receiving IVF drugs for egg retrieval accordingly are unknown";
8. "fails to inform the voters of the potential short-term and long-term risks associated with the human egg donation that is needed for embryonic stem cell research";
9. "fails to inform the voters that because of the large numbers of human eggs required for embryonic stem cell research and somatic cell nuclear transfer, obtaining those eggs will place large numbers of women at risk";
10. "fails to inform the voters that it is impossible to obtain true informed consent from women donating eggs given the current lack of adequate safety data";
11. "fails to inform the voters that the large numbers of human eggs required for embryonic stem cell research and somatic cell nuclear transfer will be an economic incentive for women to accept payment for the extraction of their eggs and that the majority of such women likely will be poor";
12. "fails to inform the voters that to provide funds to meet the interest and principal payment requirements for the outstanding bonds and refunding bonds to be issued under the Act, the Act specifies that in the first instance revenues will be derived from . . . the collection of taxes under the Sales and Use Tax Act [N.J.S.A. 54:32B-1 to -55], or so much thereof as may be required";
13. "fails to inform the voters that to provide funds to meet the interest and principal payment requirements for the outstanding bonds and refunding bonds to be issued under the Act, the Act specifies [in L. 2007, c. 117, § 12(b)] that, in the second instance, if the Sales and Use Tax Act revenues are insufficient or unavailable, there is to be assessed in every municipality a tax on the real and personal property upon which municipal taxes are assessed, levied and collected sufficient to meet the interest on the bonds";
14. "fails to inform the voters that the issuance of $450,000,000 in general obligation bonds to finance stem cell research grants will, over time, result in significant debt service costs to the State and that the Office of Legislative Services cannot provide specific cost information in that regard, as such a task would necessitate predicting the terms of the envisioned bond issuance";
15. "fails to inform the voters that if the proposed bonds are issued at the rate of $45 million per year for ten years beginning in State fiscal year 2008, with each issue sold under current market conditions with a twenty-year maturity and a level debt service schedule, annual debt service would commence in fiscal year 2009 at about $3.7 million per year, then increase by that amount annually for the next nine years to a peak of about $37 million per year, then decline after another 10 years by $3.7 million per year for the next ten years";
16. "fails to inform the voters that given the uncertainty of stem cell research grants resulting in financial gain to a grantee that would then be shared with the State, no estimate of increased State revenue from that source is feasible."
In considering these assertions and plaintiffs' application for an interlocutory injunction, which, if granted, would prohibit the printing of the ballots for the November 6 election pending adjudication of the complaint, Judge Neil H. Shuster considered the familiar factors applicable to *657 requests for interlocutory injunctions, and concluded that plaintiffs had failed: to demonstrate a reasonable likelihood of success on the merits; that a denial of injunctive relief would not cause plaintiffs irreparable harm; that the balancing of the equities favored denial of relief; and that the court's intervention into the election was not in the public interest.
Judge Shuster filed his written opinion on September 25, 2007 and, on the same day, entered an order denying plaintiffs' request for temporary restraints. At that time, plaintiffs neither moved for leave to appeal nor sought emergent relief from this court. As a result, the county clerks continued to ensure the printing and mailing of ballots for the November 6 election with the inclusion of the interpretive statement contained in the Act, L. 2007, c. 117, § 23.
The record on appeal reveals that Judge Shuster next entered an order dismissing the complaint on October 3, 2007. From what we learned at oral argument, it appears that the parties invited Judge Shuster's expedited ruling on the merits in order to achieve finality. Plaintiffs filed a notice of appeal and submitted an emergent application to this court on October 11, 2007. The next day we ordered an expedited briefing schedule, directed that oral argument on the merits of the appeal be heard on October 22, 2007, and denied any affirmative relief pending our disposition of the merits of this appeal.

II
The most pressing question posed by this appeal is whether the trial judge erroneously refused to grant injunctive relief. We conclude that he did not. In denying relief, Judge Shuster correctly considered whether plaintiffs had demonstrated a reasonable probability of success on the merits; whether a balancing of the equities and hardships weighed in favor of injunctive relief; whether substantial and irreparable injury was imminent; and whether the entry of injunctive relief was in the public interest. Crowe v. DeGioia, 90 N.J. 126, 132-34, 447 A.2d 173 (1982); Subcarrier Communications, Inc. v. Day, 299 N.J.Super. 634, 638, 691 A.2d 876 (App. Div.1997); J.H. Renarde, Inc. v. Sims, 312 N.J.Super. 195, 206, 711 A.2d 410 (Ch.Div. 1998). Although it is generally understood that all these factors must weigh in favor of injunctive relief, see, e.g., S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 374 (3d Cir.1992); Sherman v. Sherman, 330 N.J.Super. 638, 642-43, 750 A.2d 229 (Ch. Div.1999), we have held that a court may take a less rigid view in its consideration of these factors when the interlocutory injunction sought is designed to merely preserve the status quo, General Elec. Co. v. Gem Vacuum Stores, Inc., 36 N.J.Super. 234, 236-37, 115 A.2d 626 (App.Div.1955). In the matter at hand, however, plaintiffs did not seek to preserve the status quo; instead they would have had the court significantly alter the status quo by first halting the printing of the ballots, and then by either imposing an alternative interpretive statement or barring inclusion of the Act on the ballot in any form. Thus, the correct approach, which was taken by Judge Shuster, was to determine whether all the so-called Crowe factors were present, Sherman, supra, 330 N.J.Super. at 643, 750 A.2d 229, and whether they clearly and convincingly supported the entry of injunctive relief, Subcarrier, supra, 299 N.J.Super. at 639, 691 A.2d 876.
Judge Shuster found an absence of irreparable injury sufficient to warrant injunctive relief because he believed plaintiffs would be able to challenge the validity of the interpretive statement after the election. We harbor doubts about that point, but find that we need not definitely *658 resolve that interesting legal question at this time. We are, instead, satisfied that the judge correctly observed that plaintiffs were obligated to proceed with greater alacrity than exhibited here, and that their fear of "imminent" irreparable injury was without merit because their delay alone created the emergency, stating:
[T]he [c]ourt cannot overlook the fact that the Act in question was passed on July 26, 2007 and this action was brought [on September 18, 2007] a mere few days before the requirement that the [c]ounty [c]lerks begin the process of printing the ballots. Certainly, this issue could have been adjudicated at a much earlier stage. It is a defined and specific issue which could have been adjudicated much earlier in the process without the potential of additional costs to the public and disruption to the voting process. Due to this delay, it is [p]laintiffs, knowingly or unknowingly, who have self-created a situation where it is alleged the irreparable harm is "imminent" which could have been avoided if filed timely.
We agree with this analysis.
Indeed, these comments did little to speed plaintiffs' pursuit of appellate review. Judge Shuster rendered his opinion and denied the application for an interlocutory injunction on September 25, 2007, and, on October 3, 2007, Judge Shuster entered final judgment. Yet, plaintiffs did not move for leave to appeal the September 25, 2007 order. Nor did plaintiffs file a notice of appeal and apply for emergent relief in this court until October 11, 2007eight days after the entry of final judgment and sixteen days after the denial of a temporary restraining order. Under normal circumstances, such delays would not appear consequential. But, faced with a general election scheduled to occur on November 6, 2007, plaintiffs' additional delay in seeking appellate review has eliminated any opportunity that may have existed for judicial intervention in any practical or effective way prior to the election.
Judge Shuster also concluded that the balancing of the hardships weighed heavily against the granting of injunctive relief. We again agree. The Act, which was signed by Governor Jon Corzine on July 26, 2007, included the methodology for seeking the voters' approval of the Act at the November 6, 2007 general election. County clerks are charged by law with having the ballot ready for submission to the printer on or before forty-three days before the election, N.J.S.A. 19:14-1, i.e., September 21, 2007, and to begin mailing absentee ballots "as soon as practicable after the 40th day preceding the day upon which the election is to be held," N.J.S.A. 19:57-11, i.e., September 27, 2007. Judge Shuster correctly observed that the granting of injunctive relief and his intervention into the election process would generate additional costs for the county clerks and would also create hardships for the voting public by jeopardizing  if not precluding  their receipt of sample ballots as well as the mailing and receipt of military and absentee ballots in a timely fashion.
And we agree with Judge Shuster's determination that the public interest would not be served by injunctive relief. Certainly, if plaintiffs are correct about the inadequacy of the interpretive statement, then the public interest would be benefited by a change in the ballot's content. However, we conclude that the interpretive statement meets the applicable standards, for reasons which we will shortly discuss, and, therefore, any interference with the election process would not serve but rather create obstacles in "the paramount right of the voters to exercise the franchise." N.J. Democratic Party, Inc. v. Samson, 175 N.J. 178, 190, 814 A.2d 1028 (2002).
*659 For these reasons, as well as for the reasons that follow regarding the merits of plaintiffs' attack on the interpretive statement, we conclude that the trial judge correctly refused to grant injunctive relief and that, in applying these same factors, we too should decline to grant any relief.

III
Although it has been argued that our resolution of this appeal may await the results of the election,[1] we decline to withhold our views on the merits. Instead, we conclude that it is in the public interest to express those views and remove any cloud that may hang over the electorate as the voters decide whether to approve or disapprove the Act on November 6, 2007. Having fully and carefully considered the matter, we conclude there is no merit in those allegations that plaintiffs continue to press on appeal. We affirm the dismissal of the complaint because the standard of review, which binds our courts in such matters, is extremely deferential to the acts of the Legislature, and because we are satisfied that the interpretive statement fairly informs the voters of the nature of the Act.

A
Although plaintiffs have framed the standard of review by referencing Gormley, supra, 88 N.J. at 38-39, 438 A.2d 519, in which the Court defined the deference courts must give to an interpretive statement prepared by the Attorney General, we conclude that even greater deference is owed here, since the interpretive statement in question was adopted by the Legislature and is part of the Act. That is, the Court in Gormley observed that the legislation there in question  a proposed constitutional amendment regarding the ownership of and the disposition of state claims to land once flowed by the tide  did not incorporate an interpretive statement. 88 N.J. at 32, 438 A.2d 519. Because of the absence of such a legislatively-imposed interpretative statement, the Attorney General exercised what the Court characterized as the Attorney General's "broad responsibilities to evaluate matters of public policy and to take action he deems necessary to preserve the public good," 88 N.J. at 43, 438 A.2d 519, and drafted an interpretive statement to inform the voters of the effect of the proposed constitutional amendment that had been placed on the ballot. In describing the scope of review of an interpretive statement drafted by the Attorney General and issued by the Secretary of State, the Court held that it was required to "accord great deference to their determination not only on the basis of settled *660 principles of law, but also because of the glaring inappropriateness of judicial management and supervision of such matters." Gormley, supra, 88 N.J. at 38, 438 A.2d 519. As a result, the Court recognized that such actions should not be overturned by the courts "unless they are manifestly corrupt, arbitrary or misleading," and concluded that the deference ordinarily shown for the discretionary activities of administrative officials "must obviously be even greater than is generally the case." Id. at 38-39, 438 A.2d 519.
The Gormley Court observed another basis for "yielding to the judgment" of the Attorney General and Secretary of State  "the inappropriateness of judicial involvement." 88 N.J. at 39, 438 A.2d 519. The Court explained:
Public questions often have substantial political overtones. As here, the drafting of an interpretive statement, as well as the question itself, can pit party against party, the Executive against the Legislature, and region against region. The appearance of impartiality is as important to judicial effectiveness and legitimacy as impartiality itself, and in these matters it will often be impossible to appear impartial. Rare is the case where the inadequacy of the interpretive statement will justify the risk of judicial intervention. That risk inheres not simply in the proposal of an alternative but as well in the mere enjoining of the use of the proposed statement. Either can readily be perceived by one side or the other as both prejudicial to their cause and partial to that of their adversary.
[88 N.J. at 39, 438 A.2d 519.]
Accordingly, we must raise the level of caution that must accompany our examination of the issues since we are considering an interpretive statement that comes directly from the people's representatives in the Legislature and not from officials in the Executive Branch.
This differential standard[2] requires that we focus on the basic intent of an interpretive statement  to put the question "in simple language that can be easily understood by the voter," N.J.S.A. 19:3-6  and not whether advocates on one side of the issue might prefer that the Act's description be phrased differently to better enhance their political position. In short, we may intervene in such a circumstance only when the interpretive statement is so unclear as to preclude the voters' understanding of the true purpose of the question or so substantially unbalanced as to be biased.
The Court in Gormley recognized that the clarity demanded by N.J.S.A. 19:3-6 defies any attempt to "formulate a specific standard." 88 N.J. at 37, 438 A.2d 519. The Court held that:
the statement should serve the function of "interpreting" the public question and "setting for the true purpose" of same. Obviously there can be substantial dispute as to what the true purpose of an amendment is; indeed there may be many "true purposes." As for the standard to test the adequacy of the "brief statement" in "interpreting" the question, the statute provides no specific guidance, nor are we capable of devising any. The spirit of the statute, however, is simple and clear: the brief statement is to be added to help the voter understand more about the amendment than the public question tells him, for the purpose of aiding him in his decision. *661 To the extent possible within the limits of "a brief statement," it should try to get to the heart of the matter as understood by those who are knowledgeable about it. In some cases, as in this, the statement of "true purpose" may best be achieved by attempting to state the consequences of both adoption and rejection of the proposed amendment. In other cases some other formulation or standard may better achieve the legislative purpose, namely, supplying the voter with additional important information to help him cast his vote. In some cases it may be simply impossible to get to the heart of the matter with a brief statement.
[88 N.J. at 37-38, 438 A.2d 519.]
Applying these principles to the matter at hand, we conclude that plaintiffs have failed to demonstrate that the Act's interpretive statement fails to fairly inform the voter of the nature and potential consequences of their approval or disapproval of the Act.

B
As we have observed, plaintiffs' verified complaint[3] originally presented sixteen items they believed should have been incorporated into the interpretive statement. Our mere recitation of those contentions earlier in this opinion reveals how their inclusion in an interpretive statement  even if more tersely stated  would overwhelm the limited space available on the ballot. In this appeal, however, plaintiffs have abandoned many of their contentions and have limited their arguments to (1) the nature of the stem cell research, their belief that it "will be done on human embryos: human beings created for the specific and sole purpose of being experimented upon and then destroyed," and the absence of any reference to clones or cloning in the interpretive statement; and (2) the interpretive statement's alleged failure to inform voters that funds to meet the interest and principal payments will be generated, in the first instance, from revenues derived from the collection of sales taxes and, in the second instance, if those revenues are insufficient or unavailable, from an assessment on municipal property taxes.[4]

1.
Plaintiffs argue that the interpretive statement fails to fairly describe the content and consequences of the voters' adoption of the Act because it fails to state that the Act would permit experimentation on human embryos that would thereafter be discarded. We are satisfied that the Legislature's decision not to speak about cloning in its interpretive statement is entitled to deference, and we are convinced that this complex subject does not *662 lend itself to a fair and balanced statement that would fit within the four corners of the ballot.
Once the stuff of science fiction, the replication of a lamb named Dolly by British scientists in 1997 caused the subject of "cloning" to quickly enter common discourse. However, as persuasively observed, "it wasn't the cloning of a sheep that stirred the imagination of billions of people [but] the idea that humans could now be cloned as well." Lee M. Silver, Remaking Eden: How Genetic Engineering And Cloning Will Transform The American Family at 108. This extraordinary scientific breakthrough stimulated a religious, moral and philosophical debate between those who view cloning as treading in "God's domain," and that research on cloned cells would cause the destruction of a living human individual, and those who see the process as a mere combining of cells in a laboratory with potential beneficial consequences for individuals afflicted with debilitating diseases and severe injuries. Id. at 8-13. Fairness to the viewpoints on both ends of this debate  and every other reasonable point in between  cannot possibly be encapsulated in a brief statement that would fit on a ballot. We are satisfied that any indication in the interpretive statement about cloning would be much too abbreviated to be meaningful or anything other than misleading.
For example, if the interpretive statement were to mention cloning, a fair representation of the contents of the Act  and we must be mindful that the interpretive statement is meant to describe the Act, not the moral or religious debate on cloning  would require a statement that none of the funds that may be authorized or made available to an eligible research institution pursuant to the Act "shall be used for the purpose of human cloning." L. 2007, c. 117, § 5(e). The interpretive statement could have, thus, included a statement that the Act prohibits the expenditure of funds for the purpose of human cloning as defined by the Act. However, such a statement would not provide any greater clarity for the voter, because it would merely pose another question: what is "human cloning?" Accordingly, to probe deeper into the issue, the interpretive statement would also require inclusion of the Act's definition of "human cloning," i.e., "human asexual reproduction accomplished by introducing nuclear material from one or more human cells into a fertilized or unfertilized oocyte whose nuclear material has been removed or inactivated so as to produce a human fetus that is substantially genetically identical to a previously born human being." Id., § 3. We question how helpful this would be to a person encountering the interpretive statement in the voting booth without providing yet additional definitions. And, were we to proceed down this path, we question how the debate about cloning, which lies at the heart of plaintiffs' allegations, and how the questions posed in that debate will be impacted by approval of the Act, might be summarized in a fair manner in as few words as necessary to fit on the ballot.
At oral argument in the trial court, plaintiffs proposed an alternative interpretive statement.[5] As plaintiffs recognized in the trial court, their 283-word proposal[6] *663 is "somewhat longer" than the Legislature's 208-word interpretive statement. We are uncertain whether the ballot could accommodate such a lengthy interpretive statement, but, more importantly, we find that plaintiffs' proposed statement about cloning unfairly skews the issue, or, at the very least, raises so many other unanswered questions as to generate as much or even more confusion than it attempts to ameliorate. For example, contrary to the fact that the Act bans the use of funds for "human cloning," L. 2007, c. 117, § 5(e), plaintiffs' proposal states that "[r]esearch on cloned humans will be performed and funded." In addition, plaintiffs' proposed statement purports to explain in a nutshell the relationship between the criminal prohibition against the "cloning of a human being," N.J.S.A. 2C:11A-1, with the Act's prohibition on the use of funds to conduct research on cloned humans. Once again, to be meaningful  and fair, the conclusory statements in plaintiffs' proposal should further define how the phrase "cloning of a human being" is defined by N.J.S.A. 2C:11A-1.[7] Only then would the voter begin to appreciate the differences between the type of research that would be funded by the Act and the types of circumstances made criminal in N.J.S.A. 2C:11A-1. The many pages devoted to this subject by the parties in their written submissions to us more than amply demonstrate that a description of human cloning, let alone the scope of the Act's authorization of funds for stem cell research, cannot be crammed into an interpretive statement that would be more fair or useful than that adopted by the Legislature.
We are satisfied that the Legislature's interpretive statement about the nature of the research in question is fair and balanced. But, even if we were to agree with plaintiffs' contention that the statement should have included a discussion about the type of cloning authorized or prohibited by the Act  a conclusion we do not adopt  we still would reject plaintiffs' contentions because they have failed to demonstrate there is an alternative to the Legislature's interpretive statement that would not only meet the fairness criterion but also be sufficiently brief to fit on the ballot. Finding the Legislature's interpretive statement to be fair and balanced, and finding no better alternative, we decline to engage in what our Supreme Court has referred to as "the glaring inappropriateness of judicial management and supervision *664 of such matters." Gormley, supra, 88 N.J. at 38, 438 A.2d 519.

2.
The second ground upon which plaintiffs believe the interpretive statement is inadequate is its alleged failure to explain to the voter the manner in which the Act calls for the funding of the bonds. The Act itself contains provisions that explain how the debt created will be repaid. The primary method for generating funds to meet the interest and principal payment requirements is through revenue derived from the Sales and Use Tax Act. See L. 2007, c. 117, § 21(a). The Act also includes a "stand-by" provision, which has been utilized in numerous prior legislative enactments, and which states:
If, at any time, funds necessary to meet the interest, redemption premium, if any, and principal payments on outstanding bonds issued under this act are insufficient or not available, there shall be assessed, levied and collected annually in each of the municipalities of the counties of this State, a tax on the real and personal property upon which municipal taxes are or shall be assessed, levied and collected, sufficient to meet the interest on all outstanding bonds issued hereunder and on the bonds proposed to be issued under this act in the calendar year in which the tax is to be raised and for the payment of bonds falling due in the year following the year for which the tax is levied. The tax shall be assessed, levied and collected in the same manner and at the same time as are other taxes upon real and personal property. . . .
[L. 2007, c. 117, § 21(b).]
The Attorney General has asserted, without contradiction from plaintiffs, that this form of stand-by provision has been used in similar legislation in this State since 1933,[8] and that the interpretive statements utilized in seeking voter approval of these earlier acts, as required by the Debt Limitation clause of our constitution,[9] have utilized language consistent with that contained in the interpretive statement presently in question. This practice, which has "stood unchallenged for a considerable length of time," must be regarded "as of great importance." N.J. Ass'n on Corr. v. Lan, 80 N.J. 199, 215, 403 *665 A.2d 437 (1979). Accordingly, we see no reason, given the great deference due to the manner in which the Legislature seeks voter approval, to compel the Legislature to depart from the prior manner in which it has drafted similar interpretive statements. In short, we conclude that the interpretive statement adequately informs the voters in a fair and balanced manner of the fiscal consequences of their approval of the Act.

C
To summarize, we are satisfied that plaintiffs' contentions about the religious and moral wisdom of the Act cannot be encapsulated in an interpretive statement that would be both fair and balanced and still fit within the four corners of the ballot. More to the point, we are convinced that the Legislature's interpretive statement is fair and balanced, and that alone is determinative of the issues raised. It does not matter that a better, more informative statement could possibly be crafted.
Further debate about the meaning of the Act and its moral, fiscal and medical consequences is better left to the exchange of ideas and the political efforts of interested citizens in other fora. In this regard, we commend to the parties Chief Justice Wilentz's comments in Gormley:
We doubt very much if many voters decide a public question primarily on the content of the interpretive statement annexed to it. We also entertain substantial doubts as to the number of voters who ever read it. The field of battle is and should be the place where ideas and arguments are commonly exchanged and countered  the press, the other media, the public forum, the grocery store, the street corner, and the home.
[88 N.J. at 44, 438 A.2d 519.]
In short, plaintiffs' quarrels with the content of the interpretive statement are of insufficient merit to trigger our limited power to intervene. We are satisfied that the Legislature has fairly framed the issue for the voters and that the interpretive statement contained within the Act is entitled to our deference. Plaintiffs' concerns about the adoption of the Act are matters best pursued by them and others in fora where ideas are exchanged. That debate should not be redirected or reframed through judicial amending or editing of the interpretive statement adopted by the peoples' representatives in our Legislature.
Affirmed.
NOTES
[1] The Attorney General has suggested that, if we affirm the denial of injunctive relief, we should defer our decision on the request for declaratory relief addressed to the interpretive statement until after the election. In that manner, the case would be rendered moot if the voters defeated the measure. If, however, the voters approved it, then, according to the Attorney General, plaintiffs could continue to pursue equitable relief based upon their contentions that the interpretive statement was unlawfully biased and that the bias had a "significant impact" upon the election's result. How this litigation should proceed  or whether it may proceed  if the voters were to approve the measure is uncertain. Although elections of candidates, as well as "the approval or disapproval of any public proposition," may be contested in our courts, the grounds for such a contest do not appear to incorporate the passage of an Act because the ballot included an unfair or biased interpretive statement. See N.J.S.A. 19:29-1. Considering that the parties acknowledge and we agree that the merits of this appeal have been fully presented for a resolution at this time, we find it more jurisprudentially sound to decide the merits and not leave uncertainty  should the voters approve the Act  about the future of this litigation were we to hold our decision in abeyance until after November 6, 2007.
[2] So deferential was the approach adopted in Gormley that the Court ultimately "proposed" an interpretive statement to "settle the matter," concluding that "the mandating of such a statement" in light of the great hesitancy that should precede any judicial intervention in such matters would "be inappropriate." 88 N.J. at 41-42, 438 A.2d 519.
[3] The Bergen County Clerk argues that plaintiffs' complaint was not properly verified. We, of course, adhere to the premise that a complaint upon which a party seeks injunctive relief requires a verification of the truth of the allegations material to that request. R. 4:52-1(a); Lippmann v. Hydro-Space Tech., Inc., 77 N.J.Super. 497, 504, 187 A.2d 31 (App.Div.1962). However, the complaint primarily relies on the undisputed fact that the Act was adopted and contains certain provisions. The balance of plaintiffs' allegations consisted of their arguments about the sufficiency of the Act's interpretive statement. Those legal questions required no verification. Accordingly, we reject the Bergen County Clerk's argument that the trial judge should have denied injunctive relief simply because of the alleged lack of a verified complaint.
[4] The specific allegations underlying this first category are contained in the first, second, third and fourth counts of the complaint, and the specific allegations of this second category are contained in the twelfth and thirteenth counts of the complaint. We quoted plaintiffs' more-detailed allegations in these counts earlier in this opinion.
[5] Plaintiffs' proposal was not included in the appendix but was submitted to us after oral argument.
[6] "Approval of this act would authorize the sale of $450 million in State general obligation bonds to provide grants for stem cell, scientific, and medical research, as defined in the act, at institutions of higher education and other nonprofit and for profit entities in the State conducting scientific and medical research, provided that recurring revenues of the State are certified by the State Treasurer to be available in an amount equal to the sum necessary to satisfy the annual debt service obligations related to such bonds. Research on cloned humans will be performed and funded. New Jersey law makes criminal only human cloning which results in birth, and this act would authorize and publicly fund human cloning up to the fetal stage: eight weeks into gestation. Grants would be awarded by the Commission on Science and Technology, subject to evaluation by review panels. Bond principal and interest will be paid from sales and use tax revenues; if those revenues are insufficient, an additional tax on real and personal property will be assessed. If a grant recipient realizes a financial gain or benefit directly associated with the research funded by its grant, the recipient must make payments to the State representing a reasonable return on the State's investment, as determined by the State Treasurer. The purpose of providing these funds is to promote research that could benefit State residents afflicted with certain diseases and severe injuries; there is, however, no scientific basis for predicting if or when any actual therapies will be produced. An Office of Legislative Services report finds uncertainty that grants will result in financial gain and estimates the bonding will add as much as $37M a year to the state debt" (emphasis added).
[7] N.J.S.A. 2C:11A-1 states that "[a]s used in this section, `cloning of a human being' means the replication of a human individual by cultivating a cell with genetic material through the egg, embryo, fetal and newborn states into a new human individual."
[8] Although bond acts contain such "stand-by" provisions, which generally provide that revenues from sales and property taxes will be used to pay the principal and interest accrued on the bonds, the Legislature has not historically incorporated this repayment scheme into the interpretative statements adopted as part of these acts. See e.g., L. 1976, c. 92, §§ 20(b), 22; L. 1976, c. 93, §§ 21(b), 23; L. 1976, c. 94, §§ 21(b), 24; L. 1977, c. 208, §§ 15(b), 21; L. 1977, c. 235, §§ 21(b), 23; L. 1978, c. 78, §§ 20(b), 22; L. 1978, c. 79, §§ 20(b), 22; L. 1978, c. 118, §§ 21(c), 23; L. 1979, c. 165, §§ 21(b), 23; L. 1980, c. 119, §§ 20(b), 22; L. 1980, c. 70, §§ 20(b), 22; L. 1980, c. 68, §§ 20(b), 22; L. 1981, c. 233, §§ 4(c), 6; L. 1981, c. 276, §§ 20(b), 22; L. 1982, c. 120, §§ 20(b), 22; L. 1983, c. 354, §§ 24(c), 26; L. 1983, c. 356, §§ 20(b), 22; L. 1983, c. 363, §§ 21(b), 23; L. 1984, c. 99, §§ 22(b), 24; L. 1984, c. 157, §§ 20(b), 22; L. 1985, c. 329, §§ 25(b), 27; L. 1985, c. 330, §§ 22(b), 24; L. 1985, c. 302, §§ 20(b), 22; L. 1986, c. 113, §§ 22(b), 24; L. 1987, c. 265, §§ 31(b), 33; L. 1987, c. 178, §§ 22(b), 24; L. 1988, c. 78, §§ 22(b), 24, L. 1989, c. 181, §§ 22(b), 24; L. 1989, c. 180, §§ 22(b), 24; L. 1989, c. 184, §§ 22(b), 24; L. 1989, c. 183, §§ 31(b), 33; L. 1992, c. 88, §§ 36(b), 38; L. 1994, c. 108, §§ 21(b), 23; L. 1996, c. 70, §§ 28(b), 30; L. 1997, c. 125, §§ 21(b), 23; L. 1999, c. 181, §§ 21(b), 23; L. 2003, c. 162, §§ 26(b), 28.
[9] N.J. Const. art. VIII, § 2, ¶ 3 ("Except as hereinafter provided, no such law [authorizing bonding debt] shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon.").