**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0764-21

JOSE R. JIMENEZ, JR.,

     Plaintiff-Appellant,

v.

UNION COUNTY
IMPROVEMENT AUTHORITY
and COUNTY OF UNION,

     Defendants-Respondents.

_____

TERMINAL CONSTRUCTION
CORPORATION,

     Intervenor-Respondent.

_____

          Argued January 3, 2022 – Decided February 15, 2022

          Before Judges Messano, Accurso, and Enright.

          On appeal from an interlocutory order of the Superior
          Court of New Jersey, Law Division, Union County,
          Docket No. L-0464-21.

Greg Trif argued the cause for appellant (Trif & Modugno, LLC, attorneys; Greg Trif and Kyle H. Cassidy, of counsel and on the brief).

David L. Minchello argued the cause for respondent Union County Improvement Authority (Rainone Coughlin Minchello, LLC, attorneys; David L. Minchello and Matthew R. Tavares, of counsel and on the brief).

Kevin J. O'Connor argued the cause for respondent County of Union (Lum, Drasco & Positan, LLC, attorneys; Kevin J. O'Connor, of counsel and on the briefs).

Ronald L. Israel argued the cause for respondent Terminal Construction Corporation (Chiesa Shahinian & Giantomasi, PC, attorneys; Ronald L. Israel and Brian P. O'Neill, on the brief).

PER CURIAM

We set out the procedural history of this litigation in our August 24, 2021 order, and, because we write solely for the parties involved, we summarize only the salient points in this opinion.

We granted plaintiff, Jose R. Jimenez, Jr., leave to appeal the trial court's July 28, 2021 order dissolving temporary restraints previously entered on July 19 against defendants Union County (County), the Union County Improvement

2

Authority (UCIA), and Terminal Construction Corporation (Terminal).[1] The trial court issued those restraints based on our opinion in Dobco, Inc. v. Bergen County Improvement Authority, 468 N.J. Super. 519 (App. Div.), certif. granted, 248 N.J. 518, 542 (2021), filed during the course of this litigation.

In Dobco, we concluded the procurement process used by the Bergen County Improvement Authority to select the "redeveloper" for a project to restore the Bergen County Courthouse violated the Local Public Contracts Law (LPCL). Id. at 528. In issuing temporary restraints in this case, the trial judge determined defendants employed a similar procurement process to select Terminal as the "redeveloper" of the new county government center in Elizabeth. We agree with the trial judge that the procurement process used in this case violated the LPCL; any argument defendants have advanced to the contrary is not worthy of discussion. R. 2:11-3(e)(1)(E).

In dissolving the temporary restraints, however, the judge concluded based on certifications filed by defendants that the project, which had already commenced, would be significantly delayed, resulting in increased costs to taxpayers. The judge determined the "equities weigh[ed] heavily in favor of

---

[1] We did not grant similar relief to Dobco, Inc., plaintiff in a companion action alleging similar grounds for relief.

A-0764-21

lifting the restraints." Plaintiff's appeal sought reinstatement of preliminary restraints on further development of the project.

Regarding plaintiff's initial motion for leave to appeal, we determined he had "clearly and convincingly demonstrated a legal right to the relief" sought, as well as a likelihood of success on the merits. We specifically rejected defendants' claims the appeal was moot because significant sums had already been spent on the project. We observed that defendants proceeded at their own risk while the litigation was pending, the expenditures to date "pale[d] in comparison to the overall project costs," and the record at that point did not "establish . . . the total work has been substantially completed." Nevertheless, we affirmed the judge's order, concluding he did not mistakenly exercise his discretion.

We also stated the following, quoting specifically from the language of the Redevelopment Agreement (the Agreement), which, we note, was not executed until April 29, 2021, after we preliminarily granted the application for emergent relief in Dobco:

> [T]he certifications filed do not address the impact of restraining Phase 2 of the project pending institution of a procurement process that complies with the LPCL. We have only very brief descriptions of the two phases that are provided in the . . . Agreement. Phase 1 "includes the pre-construction work, including

demolition and clearance of the existing structures on the Project Site and the Remediation of the Project Site." From the certifications, it seems Terminal has been completing those tasks, and most expenditures have been limited to Phase 1 costs, which the . . . Agreement indicated the UCIA had the present ability to fund.

Phase 2, however, "includes the construction of the Project Improvements[,] the fit out, furnishing, and equipment of the building to be constructed on the Project Site in accordance with the RFQ/P . . . ." The funding for Phase 2 was contingent upon the UCIA issuing bonds, and it is unclear whether that actually occurred. The two phases seemingly involve discrete, non-overlapping tasks, but the certifications do not address the issue and we have no record from the trial court in this regard.

We remanded the matter to the trial judge to consider plaintiff's application for temporary restraints "to any further implementation of the project beyond Phase 1," and we entered a stay pending that remand.

Our order could have been more precise, because although we left the conduct of the remand hearing to the judge's sound discretion, we anticipated a plenary hearing would be necessary to develop a fuller record and to assess the credibility of witnesses given disputed facts. Instead, the judge limited discovery, permitting plaintiff to serve interrogatories and document demands on the UCIA and Terminal, and to depose Bibi Taylor, the project manager for the UCIA, and Donald Dinallo, president of Terminal.

5

Afterward, the judge permitted the parties to file additional briefs, which they supplemented with certifications:  plaintiff, with a certification from Hossam Ibrahim,[2] vice-president of Dobco; the UCIA, with certifications from Ted Domuracki, principal of MAST Construction Services, Inc. (MAST), and Vincent Myers, president of DI Group Architecture (DI Group); and the County, with a certification from Dieter Lerch, a certified public accountant and financial adviser to the County and the UCIA.

The judge considered oral argument and issued a written opinion supporting his order denying plaintiff's request to re-impose temporary restraints.  Based on the deposition testimony of Taylor and Dinallo, the judge concluded it was "uncontroverted . . . the project is one continuous construction project, and . . . the breakdown [between Phase 1 and Phase 2] relates to the source of funding only."  In addition, based on the certifications of Myers and Domuracki, the judge concluded taxpayers would be harmed by a delay costing "tens of millions of dollars" if the project now were required to be publicly bid. The judge found it was "untenable to expect that the project could stop, be re-bid, and have a subsequent bidder simply pick up the pieces."  He determined

---

[2]  Ibrahim was the plaintiff in our published opinion in Dobco.

the harm to defendants and taxpayers "convincingly outweigh[ed]" any harm to plaintiff and denied the request for temporary restraints.

Plaintiff again sought emergent relief, and we stayed the judge's order and granted plaintiff leave to appeal the denial of a preliminary injunction to halt any further progress on the project beyond Phase 1. We accelerated the appeal, considered the additional brief filed by the County, and heard the parties' oral arguments.

I.

We summarize the evidence adduced on remand. Taylor was the project manager for the UCIA and director of finance, treasurer and chief financial officer for the County. She said the project was necessary because the County was leasing inadequate space to meet its needs and some leases could not be renewed "because of operational needs." As project manager, Taylor was authorized to "approve all invoices . . . in connection with Phase 1 of the Project . . . not to exceed $12,098,586[]." That amount was based on a "Phase 1 schedule of values" provided by Terminal, and Taylor acknowledged Terminal could not requisition any payments for Phase 2 work until the UCIA issued additional bonds.

A-0764-21

Taylor acknowledged the UCIA was aware when it executed the Agreement that a court could ultimately void the contract. Furthermore, Taylor said additional bonds would not issue while the litigation was pending unless there was a "no merits opinion" from legal counsel; to date, a no merits opinion had not been provided. Taylor said one reason the project was divided into two phases was to permit it to commence with available funds while the litigation was resolved and before bonds were issued. Nonetheless, Taylor insisted "[t]he project [wa]s one continuous project and the phases were detailed in order to allow the project to proceed because we had a definitive deadline."

Taylor identified three payment requisitions from Terminal which the UCIA approved for payment in June, July and August 2021. Each payment specifically listed a schedule of values earmarked for discrete tasks in Phase 1, along with their completion status.

Taylor did not know whether Terminal had completed the design documents. When asked if she was "aware of anything preventing the [UCIA] from allowing Terminal to complete Phase 1 and then have another entity construct the project using the design documents prepared by Terminal," she said professionals working with the UCIA opined other professionals would not "simply accept that work. It would have to be redone and recertified under

another professional." But Taylor subsequently testified she did not know if there was anything to "prevent[] another contractor from building the project in accordance with those design documents." Taylor said the project was "slightly behind" schedule, but the May 2023 deadline for completion was "critical" because the County had to "get out of [its] leases."

Dinallo was aware of the pending lawsuit when he executed the Agreement with the UCIA on Terminal's behalf. Terminal entered into subcontracts in connection with the project and, if the Agreement were terminated, those subcontracts would also be terminated, and subcontractors paid to that date for work performed from whatever Terminal was paid. Dinallo identified a subcontract between Terminal and RSC Architects, which was performing architectural services for Phase 1. Dinallo originally said RSC was currently performing Phase 2 work by "[c]ontinuing with . . . their design work . . . that will be needed in the Phase 2 portion of work for construction." But Dinallo clarified "what [he] meant" was that "builders will be relying on the design documents when they're building." Dinallo testified the scope of work in the subcontract with RSC "continues through the life of the project," and the UCIA would own the design documents after payment.

A-0764-21

Dinallo testified that Terminal entered four written subcontracts to date. In addition to RSC, it subcontracted with: AWT Environmental Services, Inc. (AWT), for the removal of fuel oil tanks and environmental cleanup; Langan Engineering and Environmental Services, Inc. (Langan), for geotechnical civil engineering services; and Northstar Contracting Group, Inc. (Northstar), for "asbestos abatement removal and demolition" work. Dinallo said all the work performed by AWT and Northstar fell within the Phase 1 schedule of values. Langan was "performing design work in parallel with the architect," and while part of its work was within the Phase 1 schedule of values, its work would continue throughout the life of the project. Any design documents produced by Langan would belong to the UCIA upon payment. Dinallo admitted that none of the other subcontracts identified in Terminal's answers to interrogatories were in writing, and Terminal was not contractually obligated to pay any of the identified subcontractors.

Dinallo testified it was not uncommon to break a project into parts based on available financing. Terminal had not yet submitted an "amplified" schedule of values for Phase 2 tasks, but it would break down the entire price of the project once the UCIA issued bonds. Dinallo stated if bonds were not issued, he assumed the UCIA would issue a notice of termination for convenience, and

10

Terminal would be paid for work performed to that date and all design documents would then belong to the UCIA. Dinallo said that by the completion of Phase 1, the design documents would be "for the most part" complete, and as of the date of his deposition, no physical construction work had been performed on the new building.

MAST was hired by the UCIA as the owner's representative for the project. Domuracki, a principal of MAST, certified the project "cannot be 're-bid' at the conclusion of 'Phase 1' because the conclusion of 'Phase 1' is simply when initial funding for the Project is used up. It is not a break point in the work to be performed on the Project." He claimed rebidding "would result in the entire Project having to start over, including the selection of an architect and preparation of design documents" because "the work performed to date would not be warranted and any new contractor would be subject to extensive liabilities if they picked up where Terminal left off." Domuracki estimated that rebidding the project would cause completion to be delayed until March 2026; he provided an exhibit showing estimated timelines for broad categories of project tasks. He also provided an exhibit showing his calculation of an estimated $10.1 million in additional professional fees that would be incurred if the project were bid.

A-0764-21

Myers, a licensed architect and president and principal of DI Group, certified the company prepared "bridging documents" used in the procurement process and was hired by the UCIA to monitor construction. Myers said design documents in a "design/build" situation "are created in conjunction with a contractor who is guided by the Project milestones and in accordance with the guaranteed maximum price." Myers contrasted this format with a "design/bid/build" process, "where the design is set out for bids . . . , the documents are prepared in their totality, with an understanding that the finalize[d] documents will be bid by multiple contractors and are therefore not crafted in conjunction with a specific construction company." He claimed that the difference between the two formats is "significant" and that "Terminal's current design/build progress and product is not . . . consistent with design/bid/build public procurement process."

Myers certified it was "not advisable to have Terminal complete the 'design' of this Project and then subject the design to a public procurement . . . [because i]t is a completely different endeavor from what Terminal has been doing to date." "Instead, the UCIA would have to contract with a new architectural firm to design the entire Project." Even if Terminal completed the design of the project and public bids were solicited based on that design,

completion of the project would still be significantly delayed until September 2025. Lastly, Lerch certified that if completion was delayed until March 1, 2026, the County would incur additional leasing costs exceeding $20 million.

Hossam Ibrahim, vice president of Dobco, certified that he had personally worked on or managed more than 100 construction projects for public entities and was familiar with the "[d]esign/[b]uild" format. Ibrahim opined that the design documents prepared by RSC and Langan could be used by another contractor to construct the project because the "the design drawings prepared during a [d]esign/[b]uild project . . . are substantively the same as design drawings utilized for bid in a [d]esign/[b]id/[b]uild . . . project." Ibrahim claimed "[t]here is nothing unique about [d]esign/[b]uild [d]rawings that would prevent a public entity from using them on a [d]esign/[b]id/[b]uild project or that would increase the time to construct a [d]esign/[b]id/[b]uild project."

II.

Plaintiff argues preliminary injunctive relief is appropriate because equity cannot countenance an unlawful act, and the UCIA's contract with Terminal is unlawful. He maintains that any savings should the project be permitted to proceed in violation of the LPCL do not "override the public's interest in preserving the integrity of the bidding process." Plaintiff also contends that the

13

County and UCIA have unclean hands because they executed the Agreement and allowed Terminal to begin work despite the pending litigation and the appeal in Dobco.

Plaintiff also argues there is no reason the construction services associated with Phase 2 cannot be procured under the LPCL. He notes the Agreement specifically anticipated Phase 2 work could be completed by another contractor because it contained language recognizing that the agreement could be voided by the courts, and it permitted the UCIA to terminate if the lawsuit delayed the project.

The County argues that the equities weigh in favor of allowing the project to proceed because any delay required by bidding would "interfere with County operations, and lead to substantial increased costs." It contends that plaintiff is required to show "by clear and convincing evidence that the public interest will not be harmed if further implementation of the Project is restrained," and plaintiff has not carried that burden. The County contends even in his capacity as a representative of the commonweal, plaintiff has not established "there would be any financial benefits from having the Project publicly bid that would counterbalance the demonstrable harm to the public."

The UCIA argues phasing of the project was based solely on funding limitations, and it echoes the County's contention that rebidding the project would delay its completion and result in additional costs. Terminal similarly contends "immense harm" will be suffered if an injunction were entered and points to the same increased costs asserted by the County and the UCIA and delay in completion of the project.

We have considered these arguments and reverse.

The only issue before us is whether plaintiff is entitled to preliminary relief enjoining any further implementation of Phase 2 of the project. Plaintiff concedes that even if we rule in his favor, the litigation in the Law Division is ongoing and further proceedings are necessary before final judgment.

In considering if preliminary injunctive relief is appropriate, a trial court must determine "whether plaintiff[] had demonstrated a reasonable probability of success on the merits; whether a balancing of the equities and hardships weighed in favor of injunctive relief; whether substantial and irreparable injury was imminent; and whether the entry of injunctive relief was in the public interest." McKenzie v. Corzine, 396 N.J. Super. 405, 413 (App. Div. 2007) (citing Crowe v. DeGioia, 90 N.J. 126, 132–34 (1982)). "Each of these factors must be clearly and convincingly demonstrated." Waste Mgmt. of N.J., Inc. v.

15

Union Cnty. Utils. Auth., 399 N.J. Super. 508, 520 (App. Div. 2008) (citing McKenzie, 396 N.J. Super at 414). "In exercising their equitable powers, courts 'may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" Brown v. City of Paterson, 424 N.J. Super. 176, 183 (App. Div. 2012) (quoting Waste Mgmt., 399 N.J. Super. at 520–21).

Plaintiff has clearly and convincingly demonstrated a likelihood of success on the merits because his claim is on all fours with the successful claim of the plaintiff in Dobco. In that case, we held the LPCL applied to a virtually identical "design/build" construction/funding scheme whereby a county improvement authority skirted the requirements of public bidding by calling a general contractor, like Terminal, a "redeveloper." 468 N.J. Super. at 544-45.

Additionally, plaintiff has clearly and convincingly demonstrated imminent irreparable harm, not personal in nature, but rather as representative of all taxpayers in Union County. Plaintiff is entitled to all that flows from the well-established maxim that "[b]idding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good." In re Request for Proposals ##17DPP00144, 454 N.J. Super. 527, 558 (App. Div. 2018) (alteration in original) (quoting Keyes Martin & Co. v.

16

<u>Dir., Div. of Purchase & Prop., Dep't of Treasury</u>, 99 N.J. 244, 256 (1985)). Plaintiff need not demonstrate "corruption or any actual adverse effect" from the lack of bidding in this case to establish significant public harm. <u>Terminal Constr. Corp. v. Atlantic Cnty. Sewerage Auth.</u>, 67 N.J. 403, 410 (1975).

We focus our attention on whether after consideration of the evidence adduced on remand, plaintiff clearly and convincingly established that the "balancing of the equities and hardships weighed in favor of injunctive relief[,] . . . and . . . entry of injunctive relief was in the public interest." <u>McKenzie</u>, 396 N.J. Super. at 413. "Although decisions relating to injunctive relief are normally reviewed for abuse of discretion, our review is de novo where the disputed issue is a question of law." <u>Stoney v. Maple Shade Twp.</u>, 426 N.J. Super. 297, 307 (App. Div. 2012) (citing <u>Thornburgh v. Am. Coll. of Obstetricians & Gynecologists</u>, 476 U.S. 747, 757 (1986)).

A question of law — interpretation of the Agreement — was central to the trial judge's consideration of these issues. <u>See, e.g.</u>, <u>Kieffer v. Best Buy</u>, 205 N.J. 213, 222 (2011) ("The interpretation of a contract is subject to de novo review by an appellate court."). Here, the judge concluded it was "uncontroverted that the project is one continuous construction project, and that the breakdown [between Phase 1 and Phase 2] relates to the source of funding

17

only."  That determination was contrary to the clear language of the Agreement. See, e.g., Roach v. BM Motoring, LLC, 228 N.J. 163, 174 (2017) ("[T]the agreement's terms 'are to be given their plain and ordinary meaning.'" (quoting M.J. Paquet v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002))).

The Agreement specifically provides in Section 2.04(b):  "The Project consists of two phases."  Phase 1 commenced upon execution of the Agreement and "include[d] the pre-construction work, including demolition and clearance of the existing structures . . . and the [r]emediation of the [p]roject [s]ite."  The evidence on remand clearly demonstrated that Terminal had undertaken only work in Phase 1, and the UCIA had secured financing for only the tasks associated with Phase 1's table of values.

Under the Agreement, Phase 2 would only commence "following authorization of the [b]onds and include[d] the construction of the Project Improvements[,] the fit out, furnishing, and equipment of the building."  Section 2.09 of the Agreement references an attached exhibit setting forth "the critical milestones of the [p]roject," but all milestone dates for Phase 2 needed to be "reconfirmed . . . following authorization of the [b]onds."  The Agreement specifically recognized this pending litigation, listed under "[u]ncontrollable [c]ircumstances," and provided if the project were delayed for more than 120

18

days, either party could terminate the Agreement. If the Agreement were terminated for whatever reason, the UCIA would own "all reports, studies, data, plans, surveys, title reports, maps and specifications prepared by [Terminal] and third parties . . . and all documents, reports, permits and approvals obtained by [Terminal]." In other words, the work already done by RSC and Langan would be owned by the UCIA before Phase 2 began.

Despite this unambiguous language dividing the project into two phases, and including descriptions of the work contained within each, the judge concluded instead it was "uncontroverted . . . that the breakdown [between Phase 1 and Phase 2] relates to the source of funding only." He obviously relied on the testimony of Taylor and Dinallo in reaching this conclusion. Defendants' explanations, notwithstanding the Agreement's clear language to the contrary, that this was one "one continuous construction project," as the judge found, were simply post hoc rationalizations or aspirations. The Agreement's contingencies demonstrate the parties planned for certain tasks to be performed immediately with available funding, and other tasks to be performed only if: (1) this litigation no longer posed an obstacle to the issuance of more than $100 million dollars in bonds; and (2) the bonds were issued. Taylor acknowledged implicitly that Phase 2 could not occur while this litigation was pending.

A-0764-21

By concluding the project was a continuous, unitary endeavor, despite the language of the Agreement and the contingencies therein, the judge mistakenly weighed the "balancing of the equities and hardships" of the parties, whether that favored injunctive relief, and if "entry of injunctive relief was in the public interest." McKenzie, 396 N.J. Super. at 413. The UCIA and Terminal executed this Agreement after we issued our stay and agreed to hear Dobco's emergent application in the Bergen County lawsuit. Defendants made the decision to commit and spend public monies for this project despite knowing of, and indeed planning for, potential adverse results in this litigation. We do not conclude, as plaintiff contends, they acted with "unclean hands." Nonetheless, defendants' current posture and the concomitant expenditure of public funds resulted from choices they made; the consequences of those choices — delay or additional costs in bidding Phase 2 — cannot weigh in defendants' favor, yet that is precisely what the judge concluded.

As already noted, the public interest is presumptively served when public entities abide by the LPCL. The judge concluded the monies already spent by the UCIA, and the delays and additional costs alleged to be incurred if public bidding were now required, outweighed the public's interest in compliance with the law. Yet, we cannot know what the result of public bidding Phase 2 of the

project might be; we only know it will not violate the law. The entry of temporary restraints enjoining Phase 2 clearly and convincingly serves the public interest.

Reversed and remanded. Implementation of the Phase 2 of the project is stayed pending further proceedings in the trial court. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0764-21