945 A.2d 73 (2008)
399 N.J. Super. 508
WASTE MANAGEMENT OF NEW JERSEY, INC., Plaintiff-Respondent
v.
The UNION COUNTY UTILITIES AUTHORITY and IWS Transfer Systems of NJ, Inc., Defendants, and
Delaware and Hudson Railway Company, Inc., Defendant-Appellant, and
Waste Solutions Group; Bridgewater Resources, Inc., Defendants-Respondents.
Waste Management of New Jersey, Plaintiff-Respondent,
v.
The Union County Utilities Authority, Defendant-Appellant, and
Waste Solutions Group and Bridgewater Resources, Inc., Defendants-Respondents, and
IWS Transfer Systems of NJ, Inc., Defendant.
No. A-5018-06T2, No. A-5232-06T2.
Superior Court of New Jersey, Appellate Division.
Argued January 28, 2008.
Decided April 7, 2008.
*76 Thomas J. Cafferty, Lyndhurst, argued the cause for appellant Delaware and Hudson Railway Company, Inc. (Scarinci & Hollenbeck, attorneys; Andrew L. Indeck, of counsel; Mr. Indeck and Mitchell L. Pascual, on the brief).
Benjamin Clarke, Teaneck, argued the cause for appellant Union County Utilities Authority (Decotiis, Fitzpatrick, Cole & Wisler, LLP, attorneys; Jonathan L. Williams, of counsel; Mr. Clarke and Peter J. Choi, on the brief).
Jane Kozinski, Philadelphia, PA, argued the cause for respondent Waste Management of New Jersey, Inc. (Saul Ewing, LLP, attorneys; Pamela S. Goodwin, Princeton and Ms. Kozinski, on the brief).
Ross A. Lewin, Princeton, argued the cause for respondents Waste Solutions Group and Bridgewater Resources, Inc. (Drinker, Biddle & Reath, LLP, attorneys; Mr. Lewin, on the brief).
Jung W. Kim, Deputy Attorney General, argued the cause for amicus curiae New Jersey Department of Environmental Protection (Anne Milgram, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Ms. Kim, on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and C.S. FISHER.
The opinion of the court was delivered by FISHER, J.A.D.
In these appeals, we consider whether the trial judge erred in permanently enjoining defendant Union County Utilities Authority (the Authority) from awarding a contract for the removal of all non-processible solid waste within Union County to defendant Delaware and Hudson Railway Company, Inc. (DHRC), the lowest bidder.[1] DHRC's low bid proposed the transloading *77 of waste, materials onto rail cars at the Oak Island facility in Newark for rail transportation to sites in Ohio.
We initially conclude that the existing procedural framework upon which the judge acted did not permit the entry of a permanent injunction. We also have examined the record to determine whether the entry of an interlocutory injunction would have been appropriate, leading us to conclude that plaintiff Waste Management of New Jersey, Inc. (plaintiff), an unsuccessful bidder, failed to demonstrate a likelihood of success on the merits of its claim that the Authority's decision to award the contract to DHRC, the lowest bidder, was arbitrary, capricious or unreasonable. In this regard, we reject the judge's first factual basis for the injunction  that the Authority imperfectly investigated whether DHRC was a material subsidiary of its parent  because, even if true, it has not been clearly and convincingly established that the Authority ultimately reached the wrong conclusion. And we reject the judge's only other factual basis for the injunction  that DHRC's lack of a state-issued permit rendered the bid non-conforming  because it appears to us far more likely that the Interstate Commerce Commission Termination Act of 1995 (the Termination Act), 49 U.S.C.A. §§ 10101 to 11908, federally preempts the State's right to require that DHRC obtain a permit for the transloading of waste materials.
As a result, we vacate the permanent injunction and  even though we find insufficient evidence to support a finding that plaintiff demonstrated a reasonable probability of success  we remand for the trial judge's determination of whether an interlocutory injunction, limited to preserving the status quo, is appropriate in the circumstances.

I
This action was commenced by plaintiff for injunctive relief to prevent the Authority's awarding of a contract for the removal of all non-processible solid waste within Union County to DHRC, the lowest bidder. Based on its contentions that there were defects in DHRC's bid, plaintiff applied for and, on January 10, 2007, obtained an order that required defendants to show cause why, among other things, the Authority should not be preliminarily enjoined from entering into a contract with DHRC for the disposal of solid waste. The parties provided their written submissions; they also declined an invitation to provide live testimony on the questions posed by the order to show cause.
On May 25, 2007, the trial judge rendered an oral decision and entered a final judgment, which: permanently enjoined the Authority from implementing the contract with DHRC; in relying upon Meadowbrook Carting Co., Inc. v. Borough of Island Heights, 138 N.J. 307, 650 A.2d 748 (1994), denied plaintiff's application for an award to it of the contract with the Authority; and directed the Authority to rebid the contract.
As a result, DHRC and the Authority appealed to this court, arguing that the trial judge misapplied the law and facts. During the pendency of these appeals, we stayed that part of the final judgment that ordered the Authority to rebid the contract and accelerated the appeals. We also invited the New Jersey Department of Environmental Protection (DEP) to appear as amicus curiae. In addition, we have been advised that, in light of the injunction, the Authority entered into an eighteen-month agreement with the New Jersey Meadowlands Commission on June 21, 2007; this temporary contract is subject to termination pending the outcome of this suit.

*78 II
We must first consider the procedural posture of the case. This action was commenced by plaintiff's filing of a complaint and securing from the trial court the entry of an order to show cause. This was the vehicle that led to the entry of a permanent injunction and a final judgment.
The process adopted in our court rules for seeking injunctive relief Applications, however, does not allow for the entry of an order to show cause for the entry of a permanent injunction; rather, it permits only the entry of an order requiring a party to show cause why a temporary restraint or an interlocutory injunction should not issue. R. 4:52-1 and 2. See also, Solondz v. Kornmehl, 317 N.J.Super. 16, 20-21, 721 A.2d 16 (App.Div.1998).[2] Here, the order itself largely confines itself to Rule 4:52's limits. It directed defendants to show cause why an order should not be entered "preliminarily"[3] enjoining defendants in the following ways:
(a) Enjoining and restraining [the Authority] from entering into, performing or continuing performance of the Contract for Solid Waste Disposal Services . . .; and
(b) Declaring the [Authority's] award of the aforesaid contract to DHRC null and void, and further, vacate any other actions taken by Defendants in furtherance of said award or Contract; and
(c) Permanently restraining and enjoining [the Authority] from making any payments to DHRC for the performance of any work related to the Contract; and
(d) Enjoining [the Authority] from awarding the Contract to [the other unsuccessful bidders]; and
(e) Directing the [Authority] to award the Contract to Plaintiff, and to thereafter take any and all steps necessary to finalize and consummate the Contract with Plaintiff[; and]
(g) [sic] Granting such other relief as the court deems equitable and just.
[Emphasis added.]
Assuming we were to indulge the idea that a permanent injunction in this setting may be sought by way of the order to show cause procedure, we observe there is nothing about the language of the order to show cause in question that would suggest plaintiff had applied for permanent relief except for the single word highlighted in the quoted portion that appears above. We do not find persuasive the argument that the single appearance of the word "[p]ermanently" in one of the subparagraphs of the order to show cause somehow converts the application into a mechanism for the entry of a permanent injunction or a final judgment. For example, the particular subparagraph, which contains the word "permanently," relates only to the request that the court restrain the Authority "from making any payments *79 to DHRC for the performance of any work" related to the contract and did not extend to a request for a permanent injunction against the issuance of the contract to DHRC. Thus, if read literally, the order to show cause at most sought only a permanent injunction barring the Authority's payments to DHRC.
In short, the order neither precisely nor logically suggests that plaintiff sought a permanent injunction. Moreover, the single word in the order talismanically urged by plaintiff in support of their contention that the judge was authorized to enter a permanent injunction, when read literally, presents only an utterly illogical description of the application, i.e., that plaintiff sought a "preliminary" injunction that would "permanently" enjoin defendants. Consequently, we reject plaintiff's contention that the order to show cause, on its face, put the Authority and DHRC on notice that a permanent injunction or any other final relief was then being sought.
We are mindful that in practice it is not unheard of for parties to consent to a final determination on the return of an order to show cause for an interlocutory injunction when the facts are not in dispute or when an evidentiary hearing would add no illumination to the court's resolution of the issues presented. It is also not uncommon, when a plenary hearing is conducted for the purposes of resolving factual disputes on an interlocutory injunction application, for the parties to consent to have the trial judge render a final judgment. Such a sensible and practical approach often provides the parties with a swift and efficient resolution of their disputes that is not inconsistent with our rules of procedure, which favor "just determination[s], simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." R. 1:1-2. See also Ragusa v. Lau, 119 N.J. 276, 283-84, 575 A.2d 8 (1990); Kellam v. Feliciano, 376 N.J.Super. 580, 587, 871 A.2d 146 (App.Div.2005); State v. Bowen, 269 N.J.Super. 203, 213, 634 A.2d 1371 (App. Div.1993); Tumarkin v. Friedman, 17 N.J.Super. 20, 26-27, 85 A.2d 304 (App. Div.1951), certif. denied, 9 N.J. 287, 88 A.2d 39 (1952). Accordingly, we do not intend to preclude pragmatism in the resolution of disputes, but we must insist that such an approach is only appropriate when the parties understand and consent to a summary disposition of their disputes. Otherwise, the process would possess only the qualities of simplicity and efficiency, not fairness or justice.
In responding to these concerns, counsel for plaintiff, as well as counsel for defendants Waste Solutions Group and Bridgewater Resources, Inc., who were also unsuccessful bidders,[4] argue that the tenor of the proceedings on the return date of the order to show cause, when the judge asked about the impact of time on her reserved decision, suggests that the parties had either invited or acceded to a final disposition of their claims and defenses. These parties also refer us to correspondence between the trial court and counsel regarding the need for additional discovery or live testimony as further evidence of this contention. We suppose their argument is colorable, but it is hardly persuasive. What would convince us that the parties had consented to a final disposition  and what the record lacks  is a clear and unambiguous statement from the judge and the unequivocal consent of the parties to a final resolution at the interlocutory injunction stage. Absent such a *80 firm and definite statement, we conclude that the trial judge advanced too far afield when she rendered final judgment and a permanent injunction. We, thus, must conclude that the order's qualities of finality and permanency cannot persist.
This, however, does not end our inquiry.

III
Despite our conclusion that the trial judge mistakenly entered a permanent injunction, we nevertheless review the record to determine whether it would allow for the entry of an interlocutory injunction.
In determining whether to enter an interlocutory injunction, a judge must find that the movant has demonstrated a reasonable probability of success on the merits; that a balancing of the equities and hardships favors injunctive relief; that the movant has no adequate remedy at law and that the irreparable injury to be suffered in the absence of injunctive relief is substantial and imminent; and that the public interest will not be harmed. Crowe v. De Gioia, 90 N.J. 126, 132-34, 447 A.2d 173 (1982); McKenzie v. Corzine, 396 N.J.Super. 405, 413, 934 A.2d 651 (App. Div.2007); Subcarrier Common's, Inc. v. Day, 299 N.J.Super. 634, 638, 691 A.2d 876 (App.Div.1997); J.H. Renarde, Inc. v. Sims, 312 N.J.Super. 195, 206, 711 A.2d 410 (Ch.Div.1998).
Each of these factors must be clearly and convincingly demonstrated. McKenzie, supra, 396 N.J.Super. at 414, 934 A.2d 651; Subcarrier, supra, 299 N.J.Super. at 639, 691 A.2d 876; American Employers' Ins. Co. v. Elf Atochem N.A., Inc., 280 N.J.Super. 601, 610-11 n. 8, 656 A.2d 58 (App.Div.1995). However, although it is generally understood that all the Crowe factors must weigh in favor of injunctive relief, see, e.g., McKenzie, supra, 396 N.J.Super. at 414, 934 A.2d 651; Sherman v. Sherman, 330 N.J.Super. 638, 642-43, 750 A.2d 229 (Ch.Div.1999), a court may take a less rigid view than it would after a final hearing when the interlocutory injunction is merely designed to preserve the status quo. General Elec. Co. v. Gem Vacuum Stores, Inc., 36 N.J.Super. 234, 236-37, 115 A.2d 626 (App.Div.1955). The issuance of an interlocutory injunction must be squarely based on an appropriate exercise of sound judicial discretion, N.J. State Bar Ass'n v. Northern N.J. Mortgage Assocs., 22 N.J. 184, 194, 123 A.2d 498 (1956); Bancroft & Sons Co. v. Shelley Knitting Mills, Inc., 268 F.2d 569, 573 (3d Cir.1959), which  when limited to preserving the status quo during the suit's pendency  may permit the court to place less emphasis on a particular Crowe factor if another greatly requires the issuance of the remedy. Ibid.
By the same token, in some cases, such as when the public interest is greatly affected, a court may withhold relief despite a substantial showing of irreparable injury to the applicant. Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834, 857 (1944). As a result, it was recognized in Yakus that courts, in the exercise of their equitable powers, "may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." Id. at 441, 64 S.Ct. at 675, 88 L.Ed. at 858 (quoting Virginian Ry. Co. v. Sys. Fed'n, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789, 802 (1937)).
In reviewing the injunction that issued here  and in ascertaining whether it may continue to stand as an interlocutory injunction through the application of these factors  we conclude that (a) plaintiff failed to demonstrate a reasonable probability of success on both of the trial judge's factual underpinnings for the injunction, *81 but that (b) this determination does not necessarily preclude the granting of an interlocutory injunction after a full and fair weighing of the other Crowe factors, with particular regard to the impact the injunction would have on the public interest.

A

Did Plaintiff Demonstrate A Reasonable Probability of Success?
The parties' arguments have focused on the merits of their claims and defenses, which, in this context, we review in order to determine whether plaintiff demonstrated a reasonable probability of success.
In sustaining plaintiff's position on the merits, the trial judge referred only to two grounds that she found to support plaintiff's contention that the Authority should have rejected DHRC's bid. First, the trial judge agreed with the argument that the Authority's request of DHRC, after it had submitted its bid, to clarify whether it was claiming to be a "material subsidiary" of Canadian Pacific Railway supported the conclusion that the Authority had "abdicated its responsibility" to ascertain whether the bid was conforming. Second, the judge also agreed with the argument that DHRC lacked the necessary state environmental permits by rejecting the contention that DHRC is exempt from state permitting requirements because it is a rail carrier operating under the exclusive jurisdiction of the Surface Transportation Board, a federal agency.
Our consideration of these two contentions requires an analysis of the facts and circumstances outlined in the record, as well as the applicable statutes and case law.

1. The Authority's Consideration of DHRC as a Material Subsidiary
The record reveals that the Authority is a public agency responsible for implementing Union County's Solid Waste Management Plan. It holds a franchise that grants it the exclusive right to control and provide for the disposal of all solid waste generated within Union County. In 2003, the Authority awarded a disposal contract for non-processible waste to plaintiff with a termination date of June 30, 2007. In September 2006, the Authority solicited bids on a disposal contract to succeed plaintiff's existing contract.
The Authority received six bids. DHRC submitted the lowest by a significant margin of more than $12 per ton over the second lowest bidder; plaintiff submitted the fourth lowest bid. Over the five-year term of the proposed contract, the cost difference between DHRC's bid and plaintiff's bid has been estimated at $18,000,000.
In its bid, DHRC proposed to ship the waste to landfills located in Ohio and proposed to utilize a truck-to-rail transload facility located at the Oak Island rail yard in Newark. DHRC has been the owner since May 2004 of the Oak Island transload facility and has contracted with Transload America-Newark, LLC (TLA) to conduct its day-to-day operations.
Interestingly, the Oak Island facility was also made part of Essex County's Solid Waste Management Plan by an amendment adopted on December 14, 2005. Essex County incorporated this facility into its plan to accommodate a waste disposal contract that the Essex County Utilities Authority awarded to DHRC in 2005. Both the plan amendment and DHRC's disposal contract with the Essex County Utilities Authority were also approved by the New Jersey Department of Environmental Protection (DEP) in 2006. In proposing to use the Oak Island facility for the transfer of waste pursuant to a contract with the Authority, DHRC appears *82 to have proposed a mode of service that Essex County was already using with the consent of the DEP.
Against the backdrop of these general circumstances, the judge first found a basis in the record for the injunction in her belief that the Authority "abdicated" its authority to ensure that the bid was conforming by accepting DHRC's representation that it was a subsidiary that could rely on the financial statements of its principal. Specifically, the bid specifications required that bidders submit "[a] complete set of either (i) audited financial statements], or (ii) financial statements reviewed by an independent certified public accountant under generally accepted accounting principles, with full disclosure."
The specifications also provided an exception: "where such potential Bidder is a subsidiary company whose financial statements are reported on a consolidated basis with the parent company's financial statements, and the financial statements of the subsidiary are not separately prepared." In this regard, the specifications indicated that the bidder could rely upon the parent's audited financial statements subject to the following conditions:
The Authority's Project Team will review such financial statements of the parent and all information contained therein relating to the subsidiary Bidder in order to determine if the subsidiary Bidder constitutes a "material subsidiary" of the parent company. If such subsidiary constitutes a "material subsidiary" of the parent company, the Authority's Project Team will review the financial statements of the parent company (including the supplemental information relating to the subsidiary) to determine if such financial statements can be considered to be the equivalent of financial statements of the subsidiary so as to comply with the requirements of the Bid Specifications.
The specifications also stated that if the Project Team determined that the submitted financial statements could not be viewed as the equivalent of the subsidiary's, the subsidiary could nonetheless rely upon the parent's financial statements provided that "the parent company agrees to guarantee the performance of the subsidiary Bidder," but a parental guarantee was not required for a material subsidiary whose parental financial statements were determined to be acceptable "equivalent[s]."
Because DHRC submitted no financial statements of its own, and did not submit a guarantee of its performance by Canadian Pacific Railway, the Authority was required to determine whether DHRC was a "material subsidiary" of Canadian Pacific Railway, and whether the consolidated financial statements of Canadian Pacific Railway were the "equivalent" of the financial statements of DHRC. To ensure whether DHRC intended to pursue this exception to the financial statement obligation of the bid specifications, the Authority's counsel wrote to Canadian Pacific Railway. Counsel for Canadian Pacific Railway immediately responded and advised that DHRC did intend to convey that Canadian Pacific Railway's consolidated financial statements were the equivalent of DHRC's financial statements, indicating further that its subsidiaries effectively functioned as "a single rail system." As a result, the Authority's Project Team determined that DHRC was a "material subsidiary" and that Canadian Pacific Railway's financial statements could be accepted as the equivalent of DHRC's financial statements.
The Authority's determination that DHRC was a material subsidiary finds support in the discovery taken in this suit, *83 which included the depositions of the representatives of DHRC and its parent. In finding an inadequacy in the bid in this regard, we do not discern from the judge's opinion that she had ascertained that DHRC was not a material subsidiary but rather assume, from the following portion of her opinion, that the judge found fault with the scope and depth of the Authority's investigation:
[T]he Authority basically abdicated its responsibility to make the determination required by the bid specifications, relying exclusively apparently upon a conclusory statement by the bidder that it was their intention for the statements to be the equivalent of the financial statements of [DHRC] as a material subsidiary.
Stated another way, the judge appears to have held that the Authority inadequately investigated this question, although the judge never indicated whether what she believed would have been an adequate investigation could have generated a different result.
In examining the substance of the trial judge's holding, we must again consider the legal standard applicable to plaintiff's application. Because the application was for an interlocutory injunction, the judge was obligated to determine whether this alleged deficiency in DHRC's bid was clearly and convincingly demonstrated. Subcarrier, supra, 299 N.J.Super. at 639, 691 A.2d 876. And, in gauging the weight of plaintiffs claim that the bid failed to conform to the specification, the judge was obligated to give deference to the Authority's determination because judges are not entitled to overturn the authorized decisions of municipal bodies unless those decisions are arbitrary, capricious or unreasonable. Kramer v. Bd. of Adj., Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965). This standard has been applied in matters in which a public body has exercised its authority to determine the lowest responsible bidder, as then Judge (now Justice) Long recognized in speaking for this court in In re Protest of the Award of On-Line Games Prod. & Operation Servs. Contract, 279 N.J.Super. 566, 590, 653 A.2d 1145 (App. Div.1995):
[t]he standard of review on the matter of whether a bid on a local public contract conforms to specifications (which is a component of the ultimate issue of who is the lowest responsible bidder) is whether the decision was arbitrary, unreasonable or capricious.
See also Palamar Const. Inc. v. Twp. of Pennsauken, 196 N.J.Super. 241, 250, 482 A.2d 174 (App.Div.1983).
Examined in this light, we cannot say that the judge was justified in enjoining the awarding of the contract to DHRC on this basis. The judge's point of view was not that the Authority came to the wrong decision but that it insufficiently investigated the matter. Although the scope of the Authority's investigation is an appropriate area of concern, the ultimate question to be determined is not whether the Authority acted imperfectly, but whether there is insubstantial evidence to support the conclusion it reached that the DHRC was a material subsidiary. As the Court held in Kramer:
So long as the power exists to do the act complained of and there is substantial evidence to support it, the judicial branch of the government cannot interfere. . . . Even when doubt is entertained as to the wisdom of the action, or as to some part of it, there can be no judicial declaration of invalidity in the absence of clear abuse of discretion by the public agencies involved.
[45 N.J. at 296-97, 212 A.2d 153.]
To meet this standard, it is not enough to conclude that the Authority acted imperfectly *84 or, with the aid of hindsight, that it could have been more thorough. The essential question to be determined is whether, as the Court in Kramer held, there was "substantial evidence" to support the Authority's decision and, if so, whether its decision represented a "clear abuse of discretion." Ibid.
The record presented to the trial judge reveals that there was substantial evidence to support the Authority's determination that DHRC was a material subsidiary of Canadian Pacific Railway and, even if debatable, the Authority's conclusion on that point, regardless of how executed, cannot on this record be labeled a "clear abuse of discretion." Accordingly, we conclude that plaintiff failed to demonstrate a reasonable probability of success on the first reason given by the trial judge for the issuance of the injunction.

2. DHRC's Alleged Need for a State A-901 Permit
The second basis for the injunction rested on the judge's conclusion that DHRC was required to have a state permit that it did not possess. Plaintiff asserted that the proposed manner in which DHRC sought to perform the contractual work required that it possess an A-901 permit.[5] In response, DHRC argued that the Termination Act places the exclusive jurisdiction to regulate "transportation by rail," 49 U.S.C.A. § 10501(b), in the hands of the federal Surface Transportation Board, and that it could not be compelled to obtain a state A-901 permit with regard to its performance of the proposed contract.
The Court of Appeals for the Third Circuit described the interplay and conflict between federal and state law, of which the matter at hand is the latest chapter, in the following general way:
Shipping solid waste to Midwestern landfills has become big business-particularly in places like New Jersey where capacity at in-state landfills is scarce. Railroads are primary beneficiaries of the increased demand for the means of shipping waste across the country. Many railroads accommodate this demand by building facilities within their rights-of-way for the storage and loading of waste, which often is brought to the loading facility by truck. As one might imagine, transferring solid waste from truck to rail car is not the cleanest of businesses, and so the State of New Jersey has tried to regulate it. Railroading, however, is historically the subject of federal regulation, so any state regulation affecting it raises the question of preemption.
[N.Y. Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 242 (3d Cir.2007) (N.Y.Susquehanna).]
This cogent description of the conflict between federal and state concerns, however, is merely a prologue to a preemption issue that is highly nuanced and fraught with doubt.
Indeed, the problematic nature of this issue is reflected by the volatile state of the law, which has been generated by the apparent constant attempts of rail carriers to alter their contractual relationships in order to avoid state regulation. In a short span of time, no less than four reported decisions have emanated from the federal courts regarding the conflict between rail transportation activities and state environmental regulation in New Jersey. See N.Y. Susquehanna, supra, 500 F.3d 238; Hi tech Trans, LLC v. New Jersey, 382 F.3d 295 (3d Cir.2004) (Hi Tech); Hackensack *85 Riverkeeper, Inc. v. Del. Ostego Corp., 450 F.Supp.2d 467 (D.N.J.2006); J.P. Rail, Inc. v. N.J. Pinelands Comm'n, 404 F.Supp.2d 636 (D.N.J.2005).
Here, the trial judge predominantly relied on Hi Tech, and, in so holding, she rejected the unreported district court decision in N.Y. Susquehanna then available to her. However, a few months after the trial judge ruled, the Third Circuit decided N.Y. Susquehanna, finding that the district court's unpublished decision, with which the trial judge here had expressly disagreed, had correctly distinguished Hi Tech. As can be seen, as the players have apparently altered their relationships in response to the courts' decisions, the state of the law in this area continues to evolve to meet those alterations. The change in the applicable decisional law that has occurred since the entry of the injunction under review calls into question the conclusions the trial judge drew about DHRC's alleged need of a state permit.
In light of the present status of this litigation, however, we need not attempt to finally determine whether or to what extent federal preemption precludes state regulation of DHRC's activities. The time-honored approach in ascertaining whether a party has demonstrated a reasonable likelihood of success requires a determination of whether the material facts are in dispute, Crowe, supra, 90 N.J. at 133, 447 A.2d 173; Sherman, supra, 330 N.J.Super. at 645, 750 A.2d 229; Anders v. Greenlands Corp., 31 N.J.Super. 329, 338, 106 A.2d 361 (Ch.Div.1954), and whether the applicable law is settled, Crowe, supra, 90 N.J. at 133, 447 A.2d 173; Accident Index Bureau, Inc. v. Male, 95 N.J.Super. 39, 50, 229 A.2d 812 (App.Div.1967), aff'd o.b., 51 NJ. 107, 237 A.2d 880 (1968), appeal dismissed, 393 U.S. 530, 89 S.Ct. 872, 21 L.Ed.2d 754 (1969); J.H. Renarde, Inc., supra, 312 N.J.Super. at 201, 711 A.2d 410. We must, therefore, examine whether plaintiff demonstrated that the material facts favored its position  in a setting that is highly "fact-intensive," N.Y. Susquehanna, supra, 500 F.3d at 253  and, also, whether the law upon which plaintiffs claim is based is well-settled. This requires an analysis of how the particular nature of DHRC's anticipated contractual performance impacts the State's right to regulate the environmental problems generated by the nature of this industry. For the following reasons, we conclude that plaintiff failed to demonstrate by clear and convincing evidence a reasonable probability of success because the present state of the law highly favors the position advocated by DHRC and the Authority, and that the material facts, although not entirely certain, suggest at present that the Authority's determination that DHRC did not require a permit was well-founded.[6]
The bid specifications in this regard imposed the following requirements:
The Successful Bidder(s) shall be responsible for compliance at all times with Applicable Law relating to the provision of Disposal Services. As such, the Successful Bidder(s) is obligated to obtain and/or maintain all necessary permits, licenses and approvals in order to permit the uninterrupted provision of such Disposal Services.
At the time of Bid Submittal, the Transfer Station proposed to be utilized *86 by the Bidder, shall be operating pursuant to a valid NJDEP Solid Waste Facility (SWF) Permit (or such other permits as may be required by the applicable host jurisdiction).
In its bid, DHRC advised that it did not have a state A-901 permit and took the position that, as a railroad transload facility, it is exempt. As we have observed, the trial judge disagreed and held that the DHRC needed a state A-901 permit to operate its facility.
DHRC is a rail carrier, and its activities as a rail carrier may not be state-regulated. As part of the Termination Act, Congress mandated that "[t]he jurisdiction of the [Surface Transportation] Board over transportation by rail carriers . . . is exclusive . . . [and] the remedies provided under this part with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C.A. § 10501(b). Transportation in this setting is broadly defined to encompass equipment and services that are related to the carrying of passengers or property by rail. 49 U.S.C.A. § 10102(9).[7]
The dispute at hand, however, focuses on finer points. We must consider also whether DHRC engages in the "transportation" activities described in the Termination Act or whether some of its storage and handling activities are or are not integrally related to its interstate rail service or are handled by an entity that is not a "rail carrier."
As to the nature of the conduct regarding the storage and handling of waste  what has been referred to as "transloading"[8]  it now seems settled that "transloading activities fall within the Termination Act's definition of `transportation.'" N.Y. Susquehanna, supra, 500 F.3d at 248. See also Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 642 (2d Cir.), cert. denied, 546 U.S. 977, 126 S.Ct. 547, 163 L.Ed.2d 460 (2005); City of Auburn v. United States, 154 F.3d 1025, 1029-31 (9th Cir.1998), cert. denied, 527 U.S. 1022, 119 S.Ct. 2367, 144 L.Ed.2d (1999). But deeper questions remain; in N.Y. Susquehanna, the court focused on two specific questions: whether the carrier "operate[s] the transloading facilities itself' and whether "virtually all of its hauling capacity at each facility" is granted to "one shipper." 500 F.3d at 249. The trial judge's decision to enjoin the awarding of the contract to DHRC turned on her view of the first of these two specific questions.
In answering that question, the judge found that the relationship between the rail carrier and the operator in Hi Tech, which involved the same facility in question here, has not changed. Accordingly, our review requires a consideration of the *87 facts that distinguished N.Y. Susquehanna from Hi Tech, and whether the existing circumstances bring the case at hand closer to the former than the latter. In the latter case, Hi Tech operated the transloading facility under a license agreement with Canadian Pacific Railway (CPR), which was the rail carrier and owner of the property. Hi Tech, supra, 382 F.3d at 308. The court in N.Y. Susquehanna also noted other aspects of the relationship between Hi Tech and CPR:
Hi Tech constructed and maintained the facility. Moreover, the license agreement established that Hi Tech was not CPR's agent, and CPR disclaimed any liability from Hi Tech's operations. CPR did not charge shippers a fee for using the Hi Tech transloading facility (presumably, the shippers paid Hi Tech for the service).
[500 F.3d at 249 (citing Hi Tech, supra, 382 F.3d at 308).]
The court in N.Y. Susquehanna then made the following observations about the relationship of the parties in the case before it and distinguished it from Hi Tech:
This case is different [from Hi Tech] because (1) the rail carrier owned (or leased) the land and built the transloading facilities, (2) shippers pay the rail carrier to load their freight, and (3) the rail carrier does not disclaim liability for the loading process.
[500 F.3d at 249.]
Certainly, it was understandable that the trial judge would focus her review of the relationship between DHRC and TLA by resort to the decision in Hi Tech, which involved the same property in question here. But, the record provides support for the Authority's argument that this same facility now functions, unlike the circumstances in Hi Tech, under the direct ownership of DHRC. The record also provides support for the Authority's contention that although "the DHRC facility is similar to Hi Tech's," it differs
[i]n at least three other major respects . . .: 1) it is owned by a bona fide rail carrier, DHRC, which now controls and is responsible for all facility operations . . .; 2) the transloading now occurs in an enclosed building, equipped with environ-mental safeguards . . .; and 3) it now operates with DEP's express knowledge and approval.
DHRC also asserts that cited portions of the operating agreement reveal that it is DHRC and not TLA that offers and provides the transloading and rail transportation services, and that TLA has been engaged as DHRC's agent; accordingly, DHRC argues that the relationship between CPR and HTC discussed by the court in Hi Tech differs from the DHRCTLA relationship in question. See N.Y. Susquehanna, supra, 500 F.3d at 249 (noting that "Hi Tech was not CPR's agent"). In addition, DHRC cites numerous differences[9] that it claims further distinguishes *88 the relationship between CPR and Hi Tech from the relationship between DHRC and TLA, and argues that all this means that DHRC controls the operations at the facility and has embraced responsibility for any environmental problems generated at the facility from the transloading activities. Plaintiff asserts, in essence, that the operating agreement is mere window-dressing and places great  and appropriate  emphasis on the indemnification provisions of the operating agreement. It suffices to say that there are factual questions presented by the operations agreement and the type of relationship between rail carrier and facility operator that would preclude the state's attempts to require a permit.
But, to further demonstrate the extent to which the federal preemption question is highly complex, it is not the operating agreement alone that governs the question. Consideration must be given to the "complication" generated by a footnote in Hi Tech, which the court in N.Y. Susquehanna described in this way:
While the District Court's conclusion that this case is distinguishable from Hi Tech is correct, a footnote from our Hi Tech decision complicates the issue. We wrote that "[w]e do not . . . suggest that a party can contractually determine its status as a railroad carrier for regulatory purposes." 382 F.3d at 308 n. 19. This is a perplexing statement because the contract before us obviously plays some role in determining the "nature of [the loader's] . . . relationship to [the railroad]." Id. That is, after all, why it exists  to define the parties' relationship. Our point in Hi Tech, though, was that railroads and loaders may not change by contract what in practice is a substantively different relationship.
[500 F.3d at 250.]
As a result, it is not alone sufficient in defining the relationship between DHRC and TLA to simply consult their operating agreement. Inquiry must be made into their actual relationship and mode of performance  what is happening "on the ground"  in order to ensure that their actual conduct is consistent with the relationship described in the contract.
In light of this "fact-intensive" inquiry, N.Y. Susquehanna, supra, 500 F.3d at 253, we find it of little avail to delve further into the alleged distinctions between the relationships at hand and those considered in Hi Tech or N.Y. Susquehanna. We also need not dwell on plaintiff's arguments that the circumstances are akin to or at least more similar to Hi Tech than N.Y. Susquehanna. The question before us is not whether the state permitting requirement is preempted by the Termination Act, but whether plaintiff demonstrated a probability of success on this point. In other words, we must ask whether plaintiff presented clear and convincing evidence that the permitting requirement was not preempted. Because there are facts in the record to support the position advocated by the Authority and DHRC that places the present circumstances far closer to N.Y. Susquehanna than Hi Tech  notwithstanding plaintiff's disputation of those contentions  we conclude that plaintiff failed in this regard. The parties have disputed whether the operating agreement shifts the actual control of the transloading facility to DHRC; the existence of this factual dispute required a finding by the judge that plaintiff, as the party seeking injunctive relief, had failed *89 to demonstrate a reasonable probability of success.
We are further persuaded to this view by the fact that the same facility is used in the execution of the Essex County solid waste management plan. The DEP approved in 2005 the contract entered into between the Essex County Utilities Authority (ECUA) and DHRC, which we assume is operating without a state permit. We have not been provided with any persuasive reason why the DEP would have approved the ECUA-DHRC contract despite the apparent absence of the A-901 permit, but would not approve DHRC's proposed contract with the Authority absent a permit. Again, we draw no firm conclusions; we mention this apparently anomalous circumstance only as further evidence of the considerable doubt about plaintiff's contention that a permit was required.

B
Even Though Plaintiff Did Not Demonstrate A Reasonable Probability Of Success On The Merits, May An Interlocutory Injunction Nevertheless Issue?
Finding the absence of a reasonable likelihood of success does not entirely end our consideration and does not alone demonstrate that the injunction has no ground upon which to stand.
A court may issue an interlocutory injunction on a less than exacting showing if necessary to prevent the subject matter of the litigation from being "destroyed or substantially impaired." General Electric Co., supra, 36 N.J.Super. at 237, 115 A.2d 626. This, of course, does not permit the issuance of an injunction, which preserves the status quo pending the final hearing, in all cases. An application for such an injunction still must be considered in light of the Crowe factors. But, when the proposed injunction seeks only to preserve the status quo, these factors "are not to be looked upon as hard and fast and sharply defined in scope; rather they are but factors, among others, which must be weighed, one with another, all going to the exercise of an exacting judicial discretion as to whether or not to issue a preliminary injunction." General Electric Co., supra, 36 N.J.Super. at 237, 115 A.2d 626.
In other words, it is important to consider the nature of the undertaking and the status of the suit when a litigant seeks an interlocutory injunction. Judge Jerome Frank described this process in the following way:
For a preliminary injunction  as indicated by the numerous more or less synonymous adjectives used to label it  is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness. It serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began.
. . . .
. . . [Once it is determined] that the complaint was not without merit[, . . .] [a] judge must consider whether irreparable harm is likely to result to plaintiff if pendente lite (i.e., "immediately") the injunction is denied, and against this harm he must balance the harm to defendant likely to result if the relief is granted. The "hardship plaintiff will suffer * * * may make interlocutory relief imperative where the same showing at a final hearing would not outweigh the hardship the defendant would suffer *90 from a permanent injunction. Thus in view of the character and extent of the emergency presented, of the provisional and temporary character of the relief sought, of the probable period of its duration, and of the court's tentative opinion on the substantive issues involved, the factor of relative hardship is measured, on an application for interlocutory injunction, with a different yardstick from that used at final hearing." [Hamilton Watch Co., supra, 206 F.2d at 742-43 (citations and footnotes omitted).]
We agree with the general understanding that doubt about a suit's merits does not entirely preclude the entry of an interlocutory injunction designed to preserve the status quo. So long as there is some merit to the claim, a court may consider the extent to which the movant would be irreparably injured in the absence of pendente lite relief, and compare that potential harm to the relative hardship to be suffered by the opponent if an injunction preserving the status quo were to be entered. If these factors strongly favor injunctive relief, the status quo may be preserved through injunctive relief even though the claim on the merits is uncertain or attended with difficulties. See, e.g., Graf v. Hope Blag. Corp., 254 N.Y. 1, 171 N.E. 884, 888 (1930) (Cardozo, J., dissenting) ("[l]et the hardship be strong enough, and equity will find a way, though many a formula of inaction may seem to bar the path").
In short, a claim with only "some" factual merit or based on uncertain or novel legal principles may nevertheless support an interlocutory injunction, limited to preserving the status quo, so long as the harm confronting the movant is great and irreparable, and the hardship imposed on the opponent is not terribly significant, or, as required by R. 4:52-3, may be secured through the imposition of some form of security or through the imposition of other equitable terms. The anticipated duration of the interlocutory injunction also impacts on the determination.
The trial judge never viewed the matter in this light. Instead, as we have observed, the judge mistakenly concluded that she was authorized to finally decide all the issues posed. Rather than reach our own conclusions as to the need  or lack of a need  for a status quo injunction in this case pending final hearing, we will remand the matter to the trial judge to consider the propriety of such an injunction despite our doubts about the merits of plaintiff's claim.
As further guidance, we would indicate that the propriety of an interlocutory injunction has to be viewed not only with a mind toward the irreparable injury allegedly faced by plaintiff, and the hardship to befall the other affected parties if it issues, but also from the vantage point of the public. In the matter at hand, the public interest is significantly impacted, and, once defined, should play a significant role in the judge's determination. It has been held that
where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.
[Yakus v. United States, supra, 321 U.S. at 440, 64 S.Ct. at 675, 88 L.Ed. at 857.]
As indicated at the outset, DHRC's successful bid would result in considerable monetary savings when compared to the unsuccessful bids the Authority received-approximately $18,000,000 over the course of the anticipated five-year contract. A delay in the formation of the contract and *91 its performance by DHRC may generate a financial cost that also ought to be weighed in determining whether it would be appropriate to impede the awarding of the contract to DHRC pending a final hearing. In addition, the judge should consider that the absence of an injunction does not necessarily unleash an un-permitted entity loose on this State's environmental interests. Regardless of what is resolved in the lawsuit at hand, the DEP, which was not a party to this action until invited by us to file an amicus brief, will review any contract entered into by the Authority and DHRC. Indeed, the fact that the DEP would appear to have primary jurisdiction over DHRC's alleged need for an A-901 permit and its apparent need to comply with some or all of the so-called 2D regulations, N.J.A.C. 7:26-2D.1,[10] would suggest that the public interest would be protected notwithstanding the absence of an interlocutory injunction. Accordingly, the trial judge might fairly conclude that the permitting aspects of the bid requirements do not require the imposition of an injunction because DHRC's need for a permit would ultimately be reviewed by the DEP and subjected to the possibility of further review by us following a final agency decision in that regard. We also do not foreclose the trial judge from invoking the principles of primary jurisdiction and deferring her determination to DEP. See, e.g., Richardson v. Standard Guar. Ins. Co., 371 N.J.Super. 449, 853 A.2d 955 (App.Div.2004); Borough of Closter v. Abram Demaree Homestead, Inc., 365 N.J.Super. 338, 839 A.2d 110 (App.Div.), certif. denied, 179 N.J. 372, 845 A.2d 1254 (2004).[11]
To summarize, on remand, the trial judge should consider whether to impose an interlocutory injunction. In weighing the various competing aspects we have outlined, the judge must remain cognizant that the issuance of an injunction, even when only interlocutory and only to preserve the status quo, represents "the strongest weapon at the command of the court of equity." Light v. Nat'l Dyeing & Printing Co., 140 N.J.Eq. 506, 510, 55 A.2d 233 (Ch.1947). It represents a significant intrusion into the affairs of the parties, and/as here, the interests of the public  and yet often remains the most effective means to avoid an inequity. Banach v. Cannon, 356 N.J.Super. 342, 347, 812 A.2d 435 (Ch.Div.2002). Accordingly, with the Crowe test as a guide, plaintiff's application for injunctive relief, which turns on its *92 own peculiar facts and circumstances, has to be examined and may be issued only through the careful application of these principles. Canda Realty Co. v. Borough of Carteret, 136 N.J.Eq. 550, 556, 42 A.2d 859 (Ch.1945).

IV
For all these reasons, we conclude that the judge was not authorized by the existing procedural framework to enter a final judgment or a permanent injunction. Having viewed the injunction entered in favor of plaintiff as an interlocutory injunction, we have determined that plaintiff failed to demonstrate a reasonable probability of success but that the circumstances as presently understood do not necessarily militate against the entry of an interlocutory injunction.
Accordingly, we vacate the order under review and remand for further proceedings. In order to permit an orderly and un-pressured reconsideration of plaintiff's application, we will temporarily preserve the status quo and restrain the Authority and DHRC from entering into the contract for thirty days from today's judgment, within which the trial judge, in accordance with the principles outlined in this opinion, will determine whether an interlocutory injunction should or should not issue.
Vacated and remanded. We do not retain jurisdiction.
NOTES
[1] The separate appeals filed by the Authority and DHRC were calendared back-to-back and are now both decided by way of this opinion.
[2] Rule 4:67 does permit the entry of an order at the commencement of the action that requires a defendant to show cause why final judgment should not be entered. See R. 4:67-1(a). But this procedure may be engaged only in actions in which "the court is permitted by rule or by statute to proceed in a summary manner." Ibid. This action does not fit within those parameters.
[3] Rule 4:52 refers to "interlocutory" injunctions whereas Federal Rule of Civil Procedure 65 refers to "preliminary" injunctions to describe the same equitable remedy. These different terms undoubtedly contribute to the common mislabeling by counsel and our courts of "interlocutory" injunctions as "preliminary" injunctions. There is no substantive distinction. See, e.g., Hamilton Watch Co. v. Benrus Watch Co., Inc., 206 F.2d 738, 742 (2d Cir.1953).
[4] Although plaintiff and these other unsuccessful bidders have been represented separately, and have provided their own separate oral and written submissions, we will mostly refer to them collectively as plaintiff throughout the course of this opinion.
[5] This permit relates to the requirements known as the A-901 program. See N.J.S.A. 13:1E-126 to -135; N.J.A.C. 7:26-16.1 to -16.23.
[6] In light of our disposition of the appeal, we need not consider whether the Authority's opinion about DHRC's alleged need for a state permit was entitled to deference. Moreover, in light of DEP's authority to review the contract, should it ever be awarded, we question  but need not determine  the extent to which the Authority would be the final arbiter of that question.
[7] The Termination Act defines "transportation" as including:

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and
(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.
[49 U.S.C.A. § 10102(9).]
[8] "Transloading" has been described as "a term of art in the bulk transportation industry," and defined as "[t]ransferring bulk shipments from the vehicle/container of one mode to that of another at a terminal interchange point." N.Y. Susquehanna, supra, 500 F.3d at 242 n. 1 (citation omitted). In this context, "it refers to transferring solid waste from trucks (which carried it from its point of origin) to . . . rail cars (for carriage to landfills)." Ibid.
[9] Among the more than thirty distinctions urged by DHRC, we note the following: (1) DHRC provides and has the right to change the space and tracks of sufficient size and layout at the Oak Island yard; (2) DHRC shall be the owner of any improvements made at the facility; (3) DHRC's road manager has supervisory authority over the agent operations at the facility and the yard; (4) the agent must enforce the rules and regulations regarding the yard that are promulgated and imposed by DHRC; (5) DHRC's consent is required before TLA may bring other equipment to the yard; (6) the agent must have DHRC's advance written approval for the use of all written materials in marketing the services offered; (7) all marketing materials and signage at the facility are to prominently indicate DHRC's name or logo unless otherwise provided by DHRC; (8) DHRC possesses the right, in its sole and absolute discretion, to reject any traffic movement proposals; (9) DHRC's marketing representative shall monitor and approve all marketing activities undertaken by the agent on DHRC's behalf; (10) all agreements, invoices and bills of lading for services  the form of which are subject to the approval of DHRC  are to be between DHRC and the customer.
[10] Whether or to what extent DHRC may be obligated to comply with the 2D regulations is also a matter in flux. The district court in N.Y. Susquehanna found that these regulations were preempted by federal law. The court of appeals, however, concluded that this holding went too far and remanded the matter to the district court for a determination of whether the 2D regulations, are non-discriminatory and do not unreasonably burden rail carriers. N.Y. Susquehanna, supra, 500 F.3d at 257. As a result, whether some or all of the 2D regulations may be imposed on DHRC in its performance of the proposed contract is presently unclear.
[11] Yet additional uncertainty about the preemption issue is presented by DEP's apparent change of course regarding its permitting requirements. This is demonstrated by the following passage in DEP's amicus brief: "Here, we note that in DEP's response to comments to DEP's proposed rule adoptions, DEP stated that the exemption from A-901 requirements applies to rail carriers and those acting on their behalf. This response, however, contradicts the clear language of the regulation, and DEP's position is that the clear language prevails." We offer or intimate no view as to whether this apparent change in position comports with the Administrative Procedure Act, N.J.S.A. 52:14B-4. See Cooper University Hosp. v. Jacobs, 191 N.J. 125, 145-47, 922 A.2d 731 (2007); Metromedia, Inc. v. Director, Div. of Tax., 97 N.J. 313, 331-32, 478 A.2d 742 (1984).