**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0371-23

MATTHEW J. PLATKIN,
Attorney General of New
Jersey and SUNDEEP IYER,
Director, New Jersey
Division on Civil Rights,

     Plaintiffs-Respondents,

v.

HANOVER TOWNSHIP
BOARD OF EDUCATION and
HANOVER TOWNSHIP PUBLIC
SCHOOLS,

     Defendants-Appellants.

_____

Argued November 19, 2024 – Decided February 10, 2025

Before Judges Gilson, Bishop-Thompson, and Augostini.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. C-000042-23.

Matthew J. Giacobbe argued the cause for appellants (Cleary, Giacobbe Alfieri & Jacobs, LLC, attorneys; Matthew J. Giacobbe, of counsel and on the briefs).

Daniel Resler, Deputy Attorney General, argued the cause for respondents (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General; Mayur P. Saxena and Sara M. Gregory, Assistant Attorneys General, of counsel and on the brief; Liza Fleming, Nancy M. Trasande, Jonathan Mangel, Sarah Nealon, Douglas R. Praschak, Daniel Resler, and Amanda I. Morejón, Deputy Attorneys General, on the brief).

PER CURIAM

Hanover Township Board of Education and Hanover Township Public Schools (collectively, the Board) appeal from an order preliminarily enjoining the Board from implementing policies that changed how school staff would address students' gender identifications. The question before us is whether the trial court abused its discretion in granting the preliminary injunction while the merits of the dispute are addressed in an administrative proceeding before the New Jersey Division on Civil Rights (the CR Division).

Discerning no abuse of discretion, we affirm the order that enjoins the Board from enacting the policies they adopted in May 2023 and June 2023. We note, however, that given the length of time that has passed since the injunction was entered, if the proceeding before the CR Division does not make reasonable

progress soon, the Board will have the right to move before the trial court to lift or modify the preliminary injunction.

I.

New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50, prohibits discrimination in "any place of public accommodation . . . on account of . . . sex, [or] gender identity or expression." N.J.S.A. 10:5-12(f)(1). A "place of public accommodation" includes "any kindergarten, primary and secondary school, trade or business school, high school, academy . . . or any educational institution under the supervision of the State Board of Education or the Commissioner of Education of the State of New Jersey." N.J.S.A. 10:5-5(l).

The Legislature directed the Commissioner of Education (the Commissioner) to "develop and distribute to school districts guidelines concerning transgender students . . . to assist schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students." N.J.S.A. 18A:36-41(a). Accordingly, in 2018, the Commissioner issued the Transgender Student Guidance for School Districts (State Guidance). The State Guidance explains that a school district should accept a student's asserted gender identity and "parental consent is not required." The State Guidance further states: "There is no affirmative duty for any school

3

district personnel to notify a student's parent or guardian of the student's gender identity or expression."

In 2019, the Board adopted policy "5756-Transgender Students" (the 2019 Policy). The 2019 Policy stated:

> The school district shall accept a student's asserted gender identity; parental consent is not required. A student need not meet any threshold diagnosis or treatment requirements to have his or her gender identity recognized and respected by the school district, school, or school staff members. In addition, a legal or court-ordered name change is not required. There is no affirmative duty for any school district staff member to notify a student's parent of the student's gender identity or expression.

On May 16, 2023, the Board adopted policy "8463-Parental Notice of Material Circumstances" (the New Policy). The New Policy required parental notification when school staff became aware of "any facts or circumstances that may have a material impact on the student's physical and/or mental health, safety and/or social/emotional well-being, including, without limitation [to] . . . sexual orientation[,] transitioning[,] gender identity or expression." In that regard, the New Policy provided:

> All school staff members (certificated and non-certificated personnel) and administrators shall take all necessary steps - including notifying appropriate school administrators (e.g., the Principal and/or his/her designee) - to immediately, fully and accurately inform

4

a student's parent(s) whenever such staff member is made aware of, directly or indirectly, any facts or circumstances that may have a material impact on the student's physical and/or mental health, safety and/or social/emotional well-being, including, without limitation [to] . . . sexual activity[,] sexuality[,] sexual orientation[,] transitioning[,] gender identity or expression . . . .

The following day, on May 17, 2023, the New Jersey Attorney General and the Director of the New Jersey Division on Civil Rights (collectively, the Attorney General) filed an administrative complaint with the CR Division alleging that the Board's New Policy violated the LAD. In that regard, the Attorney General asserted that the New Policy unlawfully discriminated against students based on their gender identity and gender expression.

Simultaneously with filing that administrative complaint, the Attorney General filed a verified complaint in the Chancery court seeking to preliminarily restrain the Board from implementing the New Policy while the administrative proceeding was being conducted. On May 18, 2023, the trial court issued a temporary injunction restraining the Board from implementing the New Policy. The court also requested the parties to try to negotiate a revised policy.

On June 13, 2023, the Board adopted "8463-Parental Notice Required" (the Revised Policy). The Revised Policy omitted any reference to a student's sexuality, sexual orientation, transition status, gender identity, or expression.

5

Instead, the Revised Policy directed school staff to notify a student's parents "whenever a student discloses an issue and/or exhibit[ed] behaviors that may have an adverse impact on the student's physical and/or mental health, safety and or social/emotional well-being." Specifically, the Revised Policy stated, in relevant part:

> All staff members (certificated and non-certificated personnel) and administrators shall take necessary steps - after first notifying and consulting with an appropriate school administrator (e.g., the Principal and/or his/her designee) - to promptly inform a student's parent(s) whenever a student discloses an issue and/or exhibits behaviors that may have an adverse impact on the student's physical and/or mental health, safety and or social/emotional well-being. Such notification cannot be based solely on a student's actual and/or perceived protected characteristics under the [LAD], N.J.S.A. 10:5-12(f). Parental notification is required under this policy when there is an observation and/or indicia of an adverse impact on the student's physical and/or mental health, safety and or social/emotional well-being. The notification shall be made by the appropriate administrator and/or staff member.

Shortly thereafter, the Board issued "District Regulation 8463-Parental Notification Required" (the Regulation). The Regulation provides guidance on the Revised Policy and identifies circumstances where school staff must notify a student's parent. In that regard, the Regulation states: "In addition to the parental notification required pursuant to [the Revised Policy], the following

6

Board Policies also require parental notification about matters affecting the health and/or safety of their children, including . . . 5756 (Transgender Students)."

On August 10, 2023, the Attorney General moved to amend his pleadings, seeking to restrain the Board from implementing both the New and Revised Policies. Shortly thereafter, the trial court granted the Attorney General's request for a temporary restraint against both Policies and allowed the Attorney General to amend his complaint.

On September 11, 2023, the Board repealed the 2019 Policy. The Attorney General responded by immediately moving to reinstate the 2019 Policy.

On September 29, 2023, the trial court granted the Attorney General's request for a preliminary injunction enjoining the Board from "enforcing, implementing, or otherwise giving effect" to either the New or Revised Policies until the resolution of the pending CR Division action. In support of that ruling, the trial court issued a written opinion.

In its written opinion, the trial court analyzed the factors that must be established to obtain injunctive relief. See Garden State Equal. v. Dow, 216 N.J. 314, 320-21 (2013); Crowe v. De Gioia, 90 N.J. 126, 132-34 (1982). First, the

trial court found that the Attorney General had a likelihood of success on the merits because the Revised Policy unlawfully discriminated against students based on their gender identity. In reaching that conclusion, the trial court reasoned that the LAD prohibits discrimination based on gender identity or expression and the Revised Policy treated students differently based on their gender identity. The trial court also found that the Revised Policy had an "impermissible presumption" that students who expressed a different gender identification were or likely would experience "'an adverse impact on . . . physical and/or mental health, safety and/or social/emotional well-being.'"

Addressing the threat of irreparable harm, the trial court found that the Revised Policy, if enacted, would subject students to a substantial risk of harm, including to students' mental health and physical well-being. The court also pointed out that many of the terms in the Revised Policy were vague and undefined and, therefore, would likely create situations that adversely affected students, as well as school staff members.

Concerning the relative hardships to the parties, the trial court found that students and school staff would experience greater hardships if the injunction was not enacted. In contrast, the court found there was no real harm to the Board if the New and Revised Policies were enjoined.

The trial court also considered the Board's claims concerning the constitutional rights of parents. The court reasoned that restraining the Revised Policy would not infringe on parents' rights because the Revised Policy did not limit a parent's right to educate and raise their children.

Finally, the trial court denied the Attorney General's request to compel the Board to reinstate the 2019 Policy. The court found that the 2019 Policy was not a mandatory policy, a point conceded by the Attorney General. The court also pointed out that the LAD provided protection for students even without the 2019 Policy.

The Board now appeals from the September 29, 2023 order granting the preliminary injunction.

## II.

On appeal, the Board makes six main arguments. It contends that the trial court erred in (1) finding a settled legal right; (2) determining a likelihood of success on the merits; (3) finding a showing of irreparable harm; (4) balancing the harms; (5) not considering the harm to the public interest; and (6) enjoining the New Policy, which had already been repealed.

Preliminary injunctive relief is appropriate when the moving party establishes: "(1) a likelihood of success on the merits; (2) irreparable harm; (3)

a showing that on balance the harm to the moving party is greater than the harm to the party to be restrained; and (4) [that] the public interest will not be harmed." In re Newark, 469 N.J. Super. 366, 387 (App. Div. 2021) (first citing Crowe, 90 N.J. at 132-34; and then citing Brown v. City of Paterson, 424 N.J. Super. 176, 183 (App. Div. 2012)). See also Garden State Equal., 216 N.J. at 320-21 (explaining the factors that must be found to support preliminary injunctive relief).[1]

Courts may take a less rigid view of the Crowe factors when injunctive relief is "merely designed to preserve the status quo." Waste Mgmt. of N.J., Inc. v. Morris Cnty. Mun. Utils. Auth., 433 N.J. Super. 445, 453 (App. Div. 2013) (quoting Waste Mgmt. of N.J., Inc. v. Union Cnty. Utils. Auth., 399 N.J. Super. 508, 520 (App. Div. 2008)) (internal quotation marks omitted). In that regard, "we have recognized the important role the public interest plays when implicated" and "have held 'that courts, in the exercise of their equitable powers, may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" Waste Mgmt., 433 N.J. Super. at 454 (quoting

---

[1] Courts sometimes describe the Crowe factors slightly differently, but the key factors that must be satisfied to grant injunctive relief are well-established.

Waste Mgmt., 399 N.J. Super. at 520-21) (internal quotation marks omitted). See also Brown, 424 N.J. Super. at 183 (recognizing the importance of the public interest in balancing the factors).

"An appellate court applies an abuse of discretion standard in reviewing a trial court's decision to grant or deny a preliminary injunction." Rinaldo v. RLR Inv., LLC, 387 N.J. Super. 387, 395 (App. Div. 2006). "An abuse of discretion occurs when the court's decision is made without rational explanation, inexplicably departs from established policies, or rests upon an impermissible basis." In re T.I.C.-C., 470 N.J. Super. 596, 606 (App. Div. 2022) (citing Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

1.    The Likelihood of Success on the Merits.

The LAD was enacted to eradicate "the cancer of discrimination," Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 600 (1993) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)) (internal quotation marks omitted), and it allows for "a full range of legal and equitable remedies" to prevent unlawful discrimination in a place of public accommodation, L.W. ex rel. L.G. v. Toms River Reg'l Schs. Bd. of Educ., 381 N.J. Super. 465, 489 (App. Div. 2005). "A 'place of public accommodation' includes 'any kindergarten, primary and secondary school, trade or business school, high school, academy, college and

university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey.'" Id. at 485 (quoting N.J.S.A. 10:5-5(l)).

The LAD makes it unlawful for schools to subject individuals to discrimination based on their "gender identity or expression," N.J.S.A. 10:5-12(f)(1), which the statute defines as "having or being perceived as having a gender related identity or expression whether or not stereotypically associated with a person's assigned sex at birth," N.J.S.A. 10:5-5(rr). See also C.V. ex rel. C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 311 (2023) (recognizing that a student may state a claim under the LAD for discriminatory conduct based on their gender identity or expression).

Claims of unlawful discrimination in violation of the LAD may be based on two separate theories of harm: (1) disparate treatment; and (2) disparate impact. Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 81-82 (1978). "Disparate treatment is demonstrated when a member of 'a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion' . . . ." Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 74 (App. Div. 2004) (quoting EEOC v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990)). "Disparate impact"

12

occurs where the treatment of different groups "fall[s] more harshly on one group than another." Peper, 77 N.J. at 81.

The trial court found that the Attorney General had a likelihood of success on the merits because the Revised Policy "opened the door to differential treatment based upon students' protected status, creating a condition where staff members and administrators may engage in activities violative of the LAD." Specifically, the trial court found that "a student's protected status under the LAD may . . . be unlawfully used to determine whether parental reporting is to occur as a result of subjective perception that a student suffered 'an adverse impact' of their 'physical and/or mental health, safety, and/or social/emotional well-being.'"

The Board argues that the trial court erroneously "presumed that school personnel equate protected characteristics with adverse impact[s] triggering parental notification" and pointed out that "there is no language in the [Revised] [P]olicy authorizing consideration of protected characteristics." However, the text of the New Policy expressly identified "sexual orientation; transitioning; [and] gender identity or expression" as examples of "facts or circumstances that may have a material impact on the student's [health]." This highlights the intended purpose behind the Revised Policy, which the Board enacted only a

few weeks later.  See State, Twp. of Pennsauken v. Schad, 160 N.J. 156, 170 (1999) ("If [a] text . . . is susceptible to different interpretations, the court considers extrinsic factors, such as the statute's purpose, legislative history, and statutory context to ascertain the legislature's intent.").

Thus, we discern no abuse of discretion concerning the trial court's preliminary finding.  The LAD expressly bars discrimination based on "gender identity or expression."  N.J.S.A. 10:5-12(f)(1).  That prohibition applies to the disparate treatment that would result from the Revised Policy.  Peper, 77 N.J. at 81-82; see also N.J.S.A. 10:5-12(f)(1) (prohibiting any place of public accommodation from engaging in discrimination, whether "directly or indirectly").

The Board also argues that the substantive issues concerning the New and Revised Policies are not well-settled because there is no "precedent on the issue of parental notification policies."  The lack of direct precedent, however, does not make the trial court's determination an abuse of discretion.  The New Jersey Supreme Court has recognized that the "eradication of discrimination is a public interest," Rodriguez v. Raymours Furniture Co., 225 N.J. 343, 356 (2016), and that "[d]iscrimination based on gender is 'peculiarly repugnant,'" Lehmann, 132 N.J. at 600 (quoting Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 96 (1990)).

14

Consequently, there is well-established law supporting the trial court's finding of a likelihood of success on the merits.

Moreover, the Attorney General has a well-settled right to seek injunctive relief while an administrative action is proceeding. The Legislature expressly empowered the Attorney General to proceed "in a summary manner in the Superior Court of New Jersey to obtain an injunction prohibiting" any person or entity that "has engaged in, is engaging in, or is about to engage in any practice declared to be unlawful" by the LAD. N.J.S.A. 10:5-14.1. In short, that express statutory authority, combined with the LAD's express prohibition barring discrimination based on "gender identity or expression," supports the trial court's finding of a likelihood of success on the merits.

2. Irreparable Harm.

Concerning students, the risks of harm the trial court identified included mental health issues, infliction of physical or emotional harm by immediate family members, and housing instability. In making that finding, the trial court pointed to "Issues Impacting LGBTQ Youth" by The Trevor Project and "The Report of the 2015 U.S. Transgender Survey" by The National Center for Transgender Equality. Additionally, the trial court identified several risks of harm concerning school staff. In that regard, the court found that "[t]he Revised

Policy . . . has the potential to cause irreparable harm to school staff if they misinterpret or fail to report all . . . 'behaviors that may have an adverse impact on the student's physical and/or mental health, safety and or social/emotional well-being.'"  In short, the trial court determined that the Revised Policy "will subject staff to discipline if they fail to correctly interpret [its] vague terms."

The Board now argues that the trial court erred (1) by considering the studies, which it contends are conclusory and inconsistent with respected medical opinions; and (2) by incorrectly interpreting the Revised Policy to subject school staff to discipline.  We are not persuaded by those contentions.

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). See also Boynes v. Limetree Bay Ventures LLC, 110 F.4th 604, 610 (3d Cir. 2024) ("[C]ourts typically grant preliminary injunctions based on relaxed procedures and incomplete evidence.").  Accordingly, New Jersey courts have adopted a flexible approach when evaluating probative information presented at a preliminary proceeding.  See Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 640 n.10 (2000) (taking judicial notice of a report in assessing the grounds for a preliminary injunction).

16

We discern no abuse of discretion in the trial court's determinations concerning irreparable harm. In finding risks of irreparable harm, the trial court relied primarily on the two studies in the record. The trial court implicitly decided that these studies were credible, and that decision is entitled to substantial deference. See Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999) (concluding that "[t]he trial court is granted broad discretion in determining both the relevance of the evidence to be presented and whether its probative value is substantially outweighed by its prejudicial nature")).

To the extent that the Board seeks to introduce studies to the contrary, we note that it presented these studies to the trial court, and the trial court found them to be unavailing. Moreover, the trial court did consider the Board's arguments regarding potential harm to children absent disclosure but found it to be without merit. Accordingly, we discern no abuse of discretion in the trial court's finding that there was a substantial risk of irreparable harm to students that supported injunctive relief.

We also reject the Board's argument concerning irreparable harm to school staff under the Revised Policy. The Revised Policy provides: "[S]taff members (certificated and non-certificated personnel) and administrators shall take

17

necessary steps . . . to promptly inform a student's parent(s) whenever a student discloses an issue and/or exhibits behaviors that may have an adverse impact on the student's physical and/or mental health, safety and or social/emotional well-being."  The Regulation, the guidance on how the Revised Policy would be implemented, does not explain what constitutes an "adverse impact" that would trigger parental notification.  Consequently, school staff who misinterpret the vague language within the Revised Policy may be subject to discipline.  When asked about "the potential for discipline," the Board declined to give specifics and simply stated that "the teacher[s] should be reporting anyway."  However, staff members who comply with the Revised Policy could find themselves liable for violating the LAD.  See N.J.S.A. 10:5-12(f)(1) (establishing that it is unlawful for any "owner . . . manager, superintendent, agent, or employee of any place of public accommodation" to engage in discriminatory practices); N.J.S.A.10:5-12(e) (making it unlawful for "any person, whether an employer or an employee or not" to aid or abet any violation of the LAD).  Accordingly, we discern no error in the trial court's consideration of the potential harm to school staff.

18

3.    The Balance of the Harms and the Public Interest.

The trial court also found that the balance of the harms and the public interest both supported injunctive relief. The Board argues that the trial court erred by failing to consider the "countervailing" and "irreparable harm to parental [c]onstitutional rights," specifically the harm to the parent-child relationship. Additionally, the Board again challenges the trial court's findings of irreparable harm under the Revised Policy. The constitutional argument, for the reasons discussed below, is unpersuasive. Further, we note that the Attorney General sought the injunction against the Board, and that no parents are parties to this litigation or in the administrative proceeding before the CR Division.

Regarding the findings of irreparable harm, the trial court appropriately found, relying on several studies, that the Revised Policy would harm students by discriminating against them based on their gender identity and expression. Additionally, the trial court found that the Revised Policy would harm school staff by subjecting them to discipline for failing to abide by its disclosure requirements. The New Jersey Supreme Court has recognized that the "eradication of discrimination is a public interest." Rodriguez, 225 N.J. at 356. Given the harm faced by students under the Revised Policy, and strong public interest in preventing discrimination, we discern no abuse of discretion in the

trial court's determination that the balance of harms supported granting injunctive relief.

III.

In opposing the injunction on the New and Revised Policies, the Board makes two additional arguments. First, the Board argues that the injunction will compel them to violate parents' fundamental rights protected under the Fourteenth Amendment. Second, the Board argues that the trial court erred in adjudicating a moot issue by enjoining it from enforcing the New Policy, which it had previously repealed and replaced.

1.    Parents' Fundamental Rights Under the Fourteenth Amendment.

The Fourteenth Amendment grants parents the right "to make decisions concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 66 (2000). See also Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (citing Meyer v. Nebraska, 262 U.S. 390 (1923)) ("the Due Process Clause includes the right[] . . . to direct the education and upbringing of one's children"); Prince v. Massachusetts, 321 U.S. 158, 166 (1944) ("the custody, care and nurture of the child reside first in the parents"). Accordingly, the New Jersey Supreme Court has recognized that right. See Moriarty v. Bradt, 177 N.J. 84, 115 (2003) (identifying "the fundamental right of parents to raise their

children as they see fit"); <u>Fawzy v. Fawzy</u>, 199 N.J. 456, 476 (2009) (acknowledging "the fundamental right of parents to make decisions regarding custody, parenting time, health, education, and other child-welfare issues"). Notwithstanding, we have recognized that in certain circumstances "the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment." <u>Dempsey v. Alston</u>, 405 N.J. Super. 499, 512 (App. Div. 2009) (quoting <u>C.N. v. Ridgewood Bd. of Educ.</u>, 430 F.3d 159, 182 (3d Cir. 2005)) (internal quotation marks omitted).

The Board asserts that the injunction compels them to violate parents' fundamental rights by "depriv[ing] parents of fundamental information critical to their ability to actively guide and foster their children's moral and psycho-social development." In rejecting this argument, the trial court reasoned that the Attorney General's "action is not targeting parental rights per se, but rather the policies promulgated by the Board that purportedly subject a protected class to discrimination in violation of the LAD."

A review of the record confirms that the injunction does not infringe on parents' fundamental rights under the Fourteenth Amendment. Although parents have the right to control their child's upbringing, <u>Dempsey</u>, 405 N.J. Super. at 512, caselaw from the United States Supreme Court, the Third Circuit, and New

Jersey has not extended this right to require schools to affirmatively provide parents with information. See generally Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health, 503 F.3d 256, 262 (3d Cir. 2007) (finding no "constitutional obligation on state actors to contact parents of a minor").

Additionally, as the Attorney General correctly points out, the injunction does not prevent students from voluntarily sharing information about their gender identity or expression with their parents. As the Third Circuit held in J.S. ex rel. Snyder v. Blue Mountain School District, "[a] conflict with the parents' liberty interest will not be lightly found, and, indeed, only occurs when there is some 'manipulative, coercive, or restraining conduct by the State.'" 650 F.3d 915, 933-34 (3d Cir. 2011) (quoting Anspach, 503 F.3d at 266). The Third Circuit further explained that "parents' liberty interest[s] will only be implicated if the state's action 'deprived them of their right to make decisions concerning their child,' and not when the action merely 'complicated the making and implementation of those decisions.'" Id. at 934 (quoting C.N., 430 F.3d at 184).

Applying this logic, the preliminary injunction does not implicate or interfere with parents' rights under the Fourteenth Amendment. The 2019 Policy does not impose the kind of "constraint or compulsion" that the United States Supreme Court and the New Jersey Supreme Court has found violative of

parental rights.  Anspach, 503 F.3d at 264.  Instead, the 2019 Policy directs school staff to refer to students by their preferred gender identity without requiring the school to obtain parental consent or to affirmatively notify parents.

Because the injunction does not intrude on parents' constitutionally protected rights, it should be upheld so long as it is "rationally related to the achievement of a legitimate state interest."  State v. Pimentel, 461 N.J. Super. 468, 491 (App. Div. 2019) (quoting State v. Lagares, 127 N.J. 20, 34 (1992)) (internal quotation marks omitted).  Here, the Attorney General has a legitimate interest in preventing discrimination based on gender identity or expression. N.J.S.A. 10:5-12(f)(1).  The Attorney General's action, in enjoining the Board from affirmatively disclosing a students' transgender status to their parents, is rationally related to that goal.

2.    The Board's Mootness Argument.

"[C]ourts will not decide cases in which the issue is hypothetical, [or] a judgment cannot grant effective relief[.]"  Stop & Shop Supermarket Co. v. Cnty. of Bergen, 450 N.J. Super. 286, 291 (App. Div. 2017) (all but first alteration in original) (quoting Cinque v. N.J. Dep't of Corr., 261 N.J. Super. 242, 243 (App. Div. 1993)) (internal quotation marks omitted).  "Mootness is a threshold justiciability determination rooted in the notion that judicial power is

to be exercised only when a party is immediately threatened with harm."  Ibid. (quoting Betancourt v. Trinitas Hosp., 415 N.J. Super. 301, 311 (App. Div. 2010)).  "An issue is 'moot when [a court's] decision sought in a matter, when rendered, can have no practical effect on the existing controversy.'"  Redd v. Bowman, 223 N.J. 87, 104 (2015) (quoting Deutsche Bank Nat'l Tr. Co. v. Mitchell, 422 N.J. Super. 214, 221-22 (App. Div. 2011)).

The voluntary cessation of unlawful conduct does not automatically render an issue moot.  Delanoy v. Twp. of Ocean, 245 N.J. 384, 402 n.5 (2021) (citing City of Mesquite v. Aladdin's Castle Inc., 455 U.S. 283, 289 n.10 (1982)). In that regard, voluntary cessation will only moot a case when a defendant can demonstrate that "there is no reasonable expectation that the wrong will be repeated," which is a particularly heavy burden.  Galloway Twp. Bd. of Educ. v. Galloway Twp. Educ. Ass'n, 78 N.J. 25, 42 (1978) (quoting U.S. v. W.T. Grant Co., 345 U.S. 629, 632-33 (1953)) (internal quotation marks omitted). That a dispute concerns the "legality of the challenged practice[]" and the "public interest [weighs in favor of] having the legality of the practices settled" militates against a finding of mootness.  Ibid. (quoting Grant Co., 345 U.S. at 632-33).

The Board asserts that the trial court adjudicated a moot issue by entering a preliminary injunction against the New Policy, which had already been repealed and replaced with the Revised Policy. Initially, we note that the trial court had to enjoin both the New Policy and the Revised Policy to preserve the status quo. Indeed, had the trial court only enjoined the Revised Policy, the New Policy could have been readopted. Additionally, the dispute here involves a question of whether the New and Revised Policies are legal under the LAD. That is a question of important public interest, which weighs against treating the issue as moot. See Rodriguez, 225 N.J. at 356 (holding that eradication of discrimination is in the public interest).

IV.

Preliminary injunctions are designed to be temporary because they grant relief pending a final determination on the relevant issues. Camenisch, 451 U.S. at 395 ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). Here, the trial court granted the preliminary injunction concerning the New and Revised Polices in September 2023, pending a determination in the administrative proceeding before the CR Division. That injunction was entered more than fifteen months ago.

A-0371-23

At oral argument, we inquired as to the status of the administrative proceeding before the CR Division. The parties, including the Attorney General, informed us that no substantive proceedings have been conducted nor have any substantive decisions been made by the CR Division. Our affirmance of the preliminary injunction does not preclude the Board from moving before the trial court to lift or modify the injunction if the CR Division proceeding is not prosecuted and resolved in a timely manner.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION